**Huey R. LEE, Petitioner,**

v.

**STATE OF ALABAMA, Respondent.**

Civ. A. No. 2585–N.

United States District Court,
M. D. Alabama, N. D.

Nov. 13, 1967.

MacDonald Gallion, Atty. Gen., Lloyd G. Hart, Asst. Atty. Gen., and W. Mark Anderson III, Sp. Asst. Atty. Gen., State of Alabama, Montgomery, Ala., for respondent.

Huey R. Lee, pro se.

## ORDER

JOHNSON, Chief Judge.

This case is before this Court pursuant to the mandate of the United States Court of Appeals for the Fifth Circuit, *en banc.* By order entered June 27, 1967, that Court reversed the order of this Court entered on April 25, 1965, which dismissed Lee's petition for a writ of habeas corpus in Middle District of Alabama case number Misc. 181..

One of the bases of the petition filed in this Court, and the basis for reversal by the Fifth Circuit, was the alleged failure of the State of Alabama to inquire into the question of petitioner's competence to stand trial on October 27, 1943, as that standard is set out in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). The decision of the United States Court of Appeals for the Fifth Circuit was controlled by, and its mandate issued pursuant to, the case of Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1965).

In remanding this case, the Fifth Circuit observed that:

"Although it seems clear, as we have stated, that, under Alabama law, at his actual trial there was not put in issue his then mental capacity, the state should be given an opportunity to demonstrate, if true, that such issue was in fact put in evidence, either by proper charge to the jury or by pretrial determination by the trial court, or otherwise."

It then directed:

" * * * that the state be afforded an opportunity promptly to demonstrate to the trial court that there has actually been a determination of Lee's mental capacity to stand trial on or about October 27 and 28, 1943, in default of which the trial court shall proceed to a disposition of the case in the light of the Supreme Court's decision in Pate v. Robinson, supra."

Pursuant to the opinion of the United States Court of Appeals for the Fifth Circuit, this Court, by formal order, set this matter for a hearing upon the following issues:

"(1) Whether there was in fact a constitutionally adequate determination in the state court of Lee's capacity to stand trial on or about October 27, 1943.

"If not,

"(2) Whether this Court can, at the present time, conduct an adequate and meaningful hearing on the question of Lee's competency to stand trial on October 27, 1943.

"If so,

"(3) Whether Lee was, in fact, mentally competent to stand trial on October 27, 1943.

"(4) Whether there exists 'any other basis for habeas corpus relief which' may be presented by petitioner at this time. If petitioner desires to assert any ground other than those set out in the petition in this cause presently on file, it is ORDERED that written notice thereof be given the Attorney General for the State of Alabama and the Clerk of this Court within 10 days from this date."

After setting the case and notifying the petitioner and the Attorney General for the State of Alabama, as counsel for the respondent, that the matter would be heard upon these issues, petitioner Lee presented to this Court the names of fifty-two witnesses that he requested be subpoenaed for the purpose of testifying at the hearing. Among these witnesses were Retired Associate Justice of the Supreme Court of the United States Whittaker, present Associate Justice of the Supreme Court of the United States Black, and the present Attorney General of the United States. Shortly thereafter, petitioner Lee requested that this Court issue subpoenas for twenty-two

additional witnesses—a total of seventy-four. Upon the receipt of these requests, this Court, by formal order, determined that it was unwilling to direct the issuance of subpoenas for any of the witnesses who might be reached by the subpoena power of this Court under Rule 4(f), Federal Rules of Civil Procedure, without some showing by the petitioner that their presence would be necessary and that their testimony would be material to one or more of the issues to be considered by the Court upon the hearing. Petitioner's requests for these witnesses were denied, but without prejudice to petitioner's making some showing that the witnesses were necessary and that their testimony would be material. Petitioner Lee failed and refused to make any such showing.[1]

When the case came on for a hearing, this Court, prior to proceeding, spent considerable time in an effort to determine whether the failure to subpoena any of the witnesses requested by Lee would prejudice him upon the hearing, and Lee was questioned in open court along this line. Typical questions and Lee's responses thereto are set out in the appendix attached to this order.

██ Upon Lee's failure and refusal to make any showing concerning these witnesses and in view of his responses to this Court's inquiry in open court, it was determined that this Court had no alternative except to proceed in this matter without subpoenaing these witnesses. In this connection, Lee has been allowed to proceed, and is now proceeding, in forma pauperis. The records of this court will reflect that the processes of this court have been and are available for any legitimate purpose without cost to petitioner Lee. However, a judge cannot permit the processes of the court over which he presides to be grossly abused.

At the commencement of the hearing and in an effort to afford Lee an oppor-

tunity to enlarge the issues—particularly as to his vague claims of conspiracy—inquiry was made as to what Lee understood the issues to be. In response to this inquiry, Lee alleged the following constitutional violations: loss of jurisdiction of the subject matter of the indictment by the state court; denial of a speedy trial in bad faith and through the use of § 425, Title 15, Code of Alabama; absence of competent counsel at trial—in fact, he claims his counsel acted fraudulently; use of false, collusive and malicious testimony to the effect that he was insane, thus destroying in advance of trial his credibility as a witness; suppression of his testimony on his trial in October 1943 under threat of recommitment to the state insane asylum; denial of a fair trial "in the totality of facts and circumstances," and infliction of unusual punishment "in the totality of facts and circumstances." Since Lee did not set forth in his list of contentions anything concerning his mental competency at the time he was tried by the state court in October 1943, this Court, before proceeding in this hearing, made specific inquiry of Lee concerning that matter. On this point, the following colloquy occurred:

> THE COURT: I understand your basic contention is that you were not mentally competent at the time you were tried.
>
> MR. LEE: Beg your pardon?
>
> THE COURT: I understand your basic contention is that you were not mentally competent at the time you were tried.
>
> MR. LEE: No sir; that is not my basic contention at all.
>
> THE COURT: Do you make that contention?
>
> MR. LEE: Beg your pardon?
>
> THE COURT: Do you make that contention?

[1]. Even though counsel was offered Lee upon several occasions after the remand of this case—these offers being reflected in the official court records—Lee refused to accept the assistance of counsel.

**924**

MR. LEE: Not in this proceeding; no, sir. This—this petition, this proceeding, is based solely upon the ground of conspiracy.

During the trial of this matter, and specifically during Lee's testimony, the following occurred:

THE COURT: If I understand your contention now, it is that you were sane at that time while the trial was going on?

MR. LEE: At all times, Judge Johnson, at all times; yes, sir.

THE COURT: (Nodded to indicate affirmative reply)

MR. LEE: That has—there has never at any time been any claim on my part to the contrary. And I allege it; I allege it in the—

THE COURT: All right; the jury went ahead and found you guilty, if I understand it?

MR. LEE: Yes, sir.

THE COURT: They did not find you not guilty by reason of insanity—

MR. LEE: No.

THE COURT: —but they found you guilty, and you were committed to life imprisonment?

MR. LEE: That's right.

And again:

THE COURT: The question was, do you agree with the finding of the jury, July 20, '42—

MR. LEE: I believe that they—

THE COURT: —that you were sane?

MR. LEE: —they brought in the verdict of sane because they supposed that I wanted that, I wanted a verdict of insane, and they were determined not to give me what they had reason to believe that I wanted, which was not the case—

THE COURT: All right; go ahead.

MR. LEE: —that is what I mean to say.

THE COURT: Go ahead.

MR. LEE: Yes, sir.

Q At the time of your trial, this is in 1943, were you mentally competent at that time?

A I allege that I was intrinsically; yes.

Q All right. Did you understand what was involved at that trial?

A Not totally; I did not understand the technicalities of the matter, Mr. Anderson, of Alabama law and pleadings.

Q Did you understand that you were on trial for possibly your life?

A Oh, certainly.

Q All right.

A Yes, indeed.

Q At that time, were you mentally able to participate in your own defense?

A Not with that counsel, Mr. Anderson; not with W. L. Lee, counsel.

Q Had you had different counsel who would have, as you say, cooperated with you and tried the case your way—

A Yes.

Q —you were mentally able to assist someone in that?

A I allege that I was; I claim to have been.

Q At that time, did you have sufficient present ability to consult with your lawyers with the reasonable degree of rational understanding?

A Well, now, there again, you see, you are running into the same thing; it depends on the disposition of the lawyer; there is nothing to do with my incapacity; it was his disposition to meet me on it.

Q Then any difficulty was because they would not—

A That—

Q —cooperate with you, not because of any mental incapacity on your part?

A That is my contention and my allegation, in—in alleging fraudulent counsel.

Q And at that time, you did have a rational as well as a factual understanding of what was going on?

A Absolutely; I—I did.

As a matter of fact, on this point Lee's present contention seems to be that, even though he was not mentally incompetent to stand trial, he was deprived of a constitutional right by the failure of state authorities to conduct a § 426 hearing. This contention is reflected by Lee's testimony as follows:

THE COURT: Well, do you contend that you were incompetent, mentally incompetent or insane, at that time?

MR. LEE: Sir, I—I allege that I was intrinsically sane, but that this—this—this—lunacy content that they had published upon me, and had caused to be found sufficiently in the State of Alabama, parts of which have just been read, had been circulated to the public, and were —and was given to the jury.

THE COURT: To use your words, if you were intrinsically sane at that time, why do you say there should have been a 426 hearing then?

MR. LEE: Well, that is what I know about it, or believe about it.

THE COURT: Why do you say there should have been, if you were intrinsically sane?

MR. LEE: Well, the jury had the benefit of that evidence, in which I was held to be the contrary. As —as the majority opinion of the— the Court of Appeals—

THE COURT: I know what the Court of Appeals said; I am asking what you contend?

MR. LEE: Oh, to be sure; it is—it is one thing altogether; in other words, I—I wouldn't begin to under —tell you what the truth of a matter was unless you were prepared to admit that I could, tell the truth, whether I were telling it or not.

THE COURT: Why do you say—why do you say, if you were intrinsically sane at that time, that they should have had a 426 hearing?

MR. LEE: Because the law requires it, at that time and since.

It therefore appears, without any question, that petitioner Lee has abandoned any contention that he has made in the past to this Court, to the courts of the State of Alabama, or to the state and federal appellate courts, that he was not mentally competent to stand trial in October 1943.[2] Nevertheless, since such an abandonment is unusual, to say the least, this Court finds that it is appropriate to make some findings and conclusions on the questions posed by the United States Court of Appeals for the Fifth Circuit in its remandment of this case to this court.

 As the Court of Appeals observed, Lee's commitment in October 1942 to the Alabama state hospital, where he remained from October 24, 1942 to August 3, 1943, was under § 425, Title 15, Code of Alabama. This commitment, and the reports submitted by the commission on lunacy, was for the purpose of determining Lee's "present criminal responsibility" and his criminal responsibility at the time of the commission of the crime. The proceeding conducted by the Circuit Court of Barbour County, Alabama, in July 1942 was authorized by and pursuant to § 428, Title 15, Code of Alabama, and was for the purpose of determining whether Lee, pending disposition of the charges against him, should remain in confinement or be ordered removed to an Alabama state hospital. Neither this proceeding under § 428 nor Lee's later com-

2. This Court is impressed that Lee consciously, intentionally and quite shrewdly abandoned his contention that he was not competent to stand trial, because he does not desire commitment to an Alabama mental hospital under § 426, Title 15, Code of Alabama, or, as a matter of fact, commitment to an Alabama mental hospital under any provision of the law.

mitment under § 425 was for the purpose of ascertaining Lee's mental competency to stand trial. Thus this Court finds that there was not any constitutionally adequate determination in the Alabama state court on the question of Lee's competency to stand trial on or about October 27, 1943. On the issue of whether this Court can at the present time conduct an adequate and meaningful hearing on the question of Lee's competency to stand trial on October 27, 1943, under the peculiar facts that have been developed since the remand of this case this Court can and does conclude that a meaningful hearing can be conducted and has now been conducted on that question. The peculiar facts to which this Court has reference are (1) Lee's phenomenal and outstanding recollection as to the most minute details of the events leading up to his being charged with murder by the authorities in Barbour County, Alabama, in 1942 and his very vivid, detailed recollection as to each stage of the proceedings from that time until his conviction and commitment by the Circuit Court of Barbour County, and (2) the fact that the lunacy commission, acting pursuant to § 425, Title 15, Code of Alabama, had as one of its three members Dr. J. S. Tarwater, who has since that date occupied, and continues at the present time to occupy, an official position with the state hospital at Tuscaloosa, Alabama, and who has all the records concerning Lee's commitment in that institution from October 1942 to August 1943; and Dr. Tarwater testified before this Court upon this question from these records and from his personal recollection that there can now be a meaningful hearing on the question of whether Lee was competent to stand trial in October 1943, and, furthermore, that Lee was, in fact, mentally competent to stand trial on October 27, 1943. Dr. Tarwater's testimony on this point was as follows:

Q. Based upon your examination of Mr. Lee in 1942 and 1943, as a member of this lunacy commission, and upon your review of your file with regard to him, do you believe that you can express an opinion as to Mr. Lee's mental competency to stand trial in 1943?

A. I believe that, while we were not asked that question by the Court, we were not required to give an opinion as to whether or not he could stand trial or participate in the trial. As I know Mr. Lee, and as I know him to be a very intelligent, smart person, I think he could certainly have participated in the trial.

Q. Let me ask you one other question with regard to that: As I understand what you said, the purpose of this lunacy commission is not to inquire into a man's mental competency to stand trial?

A. No. That's correct.

Q. It is rather to inquire into his criminal responsibility?

A. And his mental status.

Q. For his act?

A. That's right.

Q. In your opinion, based upon your examination of Mr. Lee and your review of the files, do you believe Mr. Lee then had sufficient ability to consult with his lawyers with a reasonable degree of rational understanding?

A. I do.

Q. In your opinion, did he then have a rational as well as a factual understanding of the proceedings against him?

A. I think he did.

Q. In your opinion, still based upon the examination and the review, could he understand the nature of the charges against him?

A. Yes.

Q. In your opinion, did he have sufficient mental competency to assist in his defense at that time?

A. I think so.

There is no inconsistency between the findings of the lunacy commission to the effect that Lee was at the time of

the commission of the crime suffering from a mental condition to such an extent that he was not criminally responsible and Dr. Tarwater's present testimony to the effect that Lee was at all times in 1943 possessed with the mental capacity to stand trial. There is a distinct difference between the degree of capacity required of one to be criminally responsible for the commission of a crime and that required of one to be competent to stand trial.

Lee was represented in the state court proceedings by outstanding trial counsel. The records reflect that he was competently and adequately represented throughout the state court proceedings. His trial counsel evidently recognized this distinction, since he moved for a § 425 determination and did not request that any determination be made as to Lee's competency to stand trial. The records and evidence before this Court reflect that at the time Lee committed the offense for which he was convicted he may have had a mental disease and that the mental disease may have been the cause of his commission of the criminal act and, further, that Lee was, in all probability, suffering from this same mental disease at the time of his trial. Nevertheless, the evidence is clear that Lee was competent to stand trial in that he understood the charges against him, he understood and comprehended the proceedings that were taking place, and he intelligently and rationally conferred with, advised and assisted his counsel in his own defense. The United States Court of Appeals for the Fourth Circuit recognized this distinction in James v. Boles, 339 F.2d 431, when it stated:

"It appears that petitioner was aware of the proceedings and understood their import. The standard by which the courts must abide in regard to the mental capacity required of one to stand trial is ably stated by the Court in Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725, 729, 730 (1957):

" 'As of the time of the trial the question, as prescribed by statute, is whether the accused is mentally competent to understand the nature of the charges against him and to assist in his defense. He may have a mental disease, and the mental disease may have been the cause of his criminal act, and he may be suffering from the same disease at the time of his trial; but it is a scientific fact that he nevertheless may be competent to stand trial under this definition of competency. A paranoiac or a pyromaniac may well understand the charges against him and be able to assist in his defense. "To assist in his defense" of course does not refer to legal questions involved but to such phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, etc. * * * ' "

The Fourth Circuit Court of Appeals in James v. Boles, supra, also recognized the significance of a defendant's testimony concerning the evidence leading up to and occurring during the state court trial. In this connection, that court stated:

"We have examined the petitioner's testimony at the time of his state court trial. It is lucid and coherent. Viewed in the light of the testimony taken in the District Court, it clearly warranted the finding that James was competent to stand trial and was thoroughly able to assist his attorney in his own defense and to actively and helpfully participate in it."

This distinction is recognized by the Supreme Court of the United States in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824.

This Court now specifically finds that Lee was, in fact, mentally competent to stand trial in October 1943 and that there was no deprivation of his constitutional rights by the failure of the Alabama authorities to conduct a hearing pursuant to § 426, Title 15, Code of Alabama, for the purpose of determining his mental competency at that time. Even if Lee's attempt to abandon

his contention that he was deprived of a constitutional right by the failure of the Alabama authorities to conduct a § 426 hearing is not accepted, the evidence presented to this Court reflects that the failure of the Alabama authorities to conduct a § 426 hearing did not amount to a deprivation of his constitutional rights. The evidence reflects that Lee was mentally competent to stand trial, and, from his testimony, the only basis upon which he rests such contention is that the law provides for a § 426 hearing and that even though he was not mentally incompetent, it was incumbent upon the State of Alabama to have him examined and a § 426 determination made. In this connection, see Wheeler v. United States, 82 U.S.App.D.C. 363, 165 F.2d 225 (1947), cert. denied 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115 (1948). Other excellent cases on this point are Hunter v. United States, 116 U.S.App. D.C. 323, 323 F.2d 625, 627–628 (D.C. Cir. 1963), rehearing denied 119 U.S. App.D.C. 174, 338 F.2d 283 (1964), cert. denied 380 U.S. 918, 85 S.Ct. 912, 13 L.Ed.2d 803 (1965); Markham v. United States, 184 F.2d 512 (4th Cir. 1950), cert. denied 340 U.S. 936, 71 S.Ct. 480, 95 L.Ed. 676 (1951). See also Clark v. Beto, 359 F.2d 554, 557 (5th Cir. 1966).

■■ As reflected above, Lee's concern at the present time is with other issues. His testimony and proof completely fail as to these other issues. Specifically, there was no denial of a speedy trial by reason of Lee's commitment under § 425, Title 15, Code of Alabama, at the Alabama mental hospital for the period October 1942 to August 1943. This commitment was requested not only by the state authorities but also by Lee's counsel. Mackey v. United States, 122 U.S.App.D.C. 97, 351 F.2d 794 (1965); Bruce v. United States, 351 F.2d 318 (5th Cir. 1965), cert. denied 384 U.S. 921, 86 S.Ct. 1370, 16 L.Ed.2d 441 (1966), rehearing denied 384 U.S. 958, 86 S.Ct. 1575, 16 L.Ed.2d 553 (1966); Reece v. United States, 337 F.2d 852 (5th Cir. 1964); Germany v. Hudspeth,

209 F.2d 15 (10th Cir. 1954), cert. denied 347 U.S. 946, 74 S.Ct. 644, 98 L.Ed. 1094 (1955). There was no absence of competent and effective representation of Lee during any phase of the state court proceedings that resulted in his present incarceration. As a matter of fact, his counsel was recognized throughout the State of Alabama as one of the state's most eminent trial lawyers in criminal cases. Lee's proof wholly fails in his contention that his trial counsel acted fraudulently. The only matter offered in support of Lee's contention that he was prejudiced by the use of testimony to the effect that he was insane, thus destroying his credibility as a witness, was Lee's conclusion that that occurred. On this point, it must be kept in mind that the primary defense that Lee and his counsel presented to the charge of murder of his father was the defense of insanity. It is true that certain testimony on this point was offered on the trial of the case. Lee's conclusion that this testimony destroyed his credibility as a witness is mere supposition. As a matter of fact, it is difficult, after reading the testimony which he gave on the trial of that case, to see how the evidence concerning his mental condition could have affected that testimony. The point that Lee makes concerning the suppression of his full testimony on his trial in October 1943, by reason of threats and intimidation of permanent recommitment to the state mental institution, is quite interesting. On this point, Lee quite candidly acknowledges that the testimony which he gave on the trial of the case in October 1943 was true only "as far as it went." That part of his testimony before this Court was as follows:

THE COURT: I have read your testimony.

MR. LEE: Yes, sir.

THE COURT: The substance of it is that you did not remember any of the occurrences that occurred on the day you were supposed to have killed your father.

MR. LEE: That is what I testified on the stand; yes, sir. My interest at that time was in the lunacy allegation. Now, you see, Judge Johnson, I had read this—

THE COURT: Was that testimony true?

MR. LEE: Beg your pardon?

THE COURT: Was that testimony true?

MR. LEE: What, that I did not—

THE COURT: That you gave, that you didn't remember it?

MR. LEE: It was true as far as it went; yes; yes.

There is no credible evidence before this Court to support any contention that Lee was threatened and intimidated unless he remained submissive to the trial court and counsel. His contention that the "totality of facts and circumstances" reflects denial of a fair trial by the Alabama authorities in 1943 is without substance. Likewise, his contention of cruel and unusual punishment has no basis in fact or in law. Green v. Teets, 244 F.2d 401 (9th Cir. 1957); United States ex rel. Bongiorno v. Ragen, 146 F.2d 349 (7th Cir. 1945), cert. denied 325 U.S. 865, 65 S.Ct. 1194, 89 L.Ed. 1985 (1946). After considering all of Lee's contentions collectively and separately and the evidence offered to support them, this Court is of the opinion that there is simply no evidence tending to prove any conspiracy against Lee.

Thus this Court concludes that there does not exist any basis for habeas corpus relief in this case.

It is therefore the order, judgment and decree of this Court that the application of Huey R. Lee for the writ of habeas corpus and his prayer for release from incarceration pursuant to the judgment of conviction in the Circuit Court of Barbour County, Alabama, in October 1943, be and each is hereby denied.

## APPENDIX

THE COURT: What testimony did you expect from Justice Black?

MR. LEE: I would be curious as to what transpired within that body in February and March, I believe, immediately prior to the retirement of the Honorable Charles E. Whittaker. I would be interested to know if he was, say, which is unlikely, but nonetheless, very curious thing, the cases in which the Supreme Court of the United States has taken up matters in which there has been the merest fragment of a showing of incompetency in causes, Bush versus State of Texas being the most conspicuous one that I can mention.

THE COURT: That the nature of the testimony you expect to elicit?

MR. LEE: It would be a part of it if he appeared—why the Supreme Court of the United States in eight times has remained totally silent with respect to the issues in this case—

THE COURT: All right; all right..

MR. LEE: —which I cite is without parallel in the entire judicial history of the country; I would cite this case in that way.

THE COURT: What testimony did you expect from the Honorable Charles Whittaker?

MR. LEE: As to his reaction to—as to whether or not he would be willing to testify concerning events at —at the time indicated immediately prior to his resignation. You under—

THE COURT: About what events?

MR. LEE: Within the Supreme Court of the United States. It so happens, Judge Johnson—

THE COURT: Does that have to [do] with cases they reviewed and opinions they wrote?

MR. LEE: No, sir. Am I giving testimony now?

THE COURT: No, no; no, I am just asking you as to the basis for your requesting me to subpoena these witnesses.

MR. LEE: Well, I—if you will—if you will listen to me, I will tell you that at that time I think the case had been presented, that was the seventh time, I believe, or the sixth, I believe; the case had gone there at that time five times previously. In silence, the Court issued per curiam denials all times. Well, I —considering the rulings that they had made in other similar cases, and particularly Blackburn versus State of Alabama—

THE COURT: What testimony did you expect from Judith Helms, newspaper reporter?

MR. LEE: I would be curious as to why she took the particular line that she did in reporting the denial of the Alabama Supreme Court of habeas corpus appeal in this case in January, I think it was, of 1964; very curiously, she seemed to be more concerned with making a case in the public mind that at some time or other I had gone on a spree. I'm just curious as to what motivates her news.

THE COURT: What testimony did you expect from Honorable Ramsey Clark, the Attorney General of the United States?

MR. LEE: I would be curious to know whether or not in the view of the Attorney General of the United States a person may have his constitutional and civil rights deprived by a conspiracy by the use of any other object than a pistol or a bullet in the head, for example; in the trial in this courtroom, as I understand it, it did occur in this courtroom, as the result of the killing of the Liuzzo woman, or if that is the pronunciation, the defendants in that cause were charged with conspiracy to violate the woman's civil rights and constitutional rights, as I understand it.

THE COURT: What testimony—

MR. LEE: Seemingly resulting from a shot in the brain. Now, if that is the only way a person's constitu-

tional and civil rights can be violated, I would like to know it. I allege a conspiracy to suppress the truth and to perpetrate the frauds that I am and have been an insane person.

THE COURT: What testimony you expect from Honorable George Wallace, the former Governor of Alabama?

MR. Lee: I would be interested in his views as an expert, on the laws of Alabama concerning in particular the said section—said Title 15, Sections 425 and 426; I would be interested in knowing his views as to whether those are the laws of the State of Alabama, and what recognition they are given in that court, since he was Judge in that court, the trial court in this case; I would be interested in knowing his—his views as an expert and also—