**William Ronald CONNER, Petitioner-Appellant,**

v.

**John W. WINGO, Warden Kentucky State Penitentiary, Respondent-Appellee.**

**No. 19869.**

United States Court of Appeals, Sixth Circuit.

June 5, 1970.

Thomas G. Hervey, Harvard Voluntary, Defenders, Cambridge, Mass., for appellant, Livingston Hall, court-appointed, Cambridge, Mass., on brief.

George F. Rabe, Frankfort, Ky., for appellee, John B. Breckinridge, Atty. Gen., George F. Rabe, Asst. Atty. Gen., Frankfort, Ky., on brief.

Before EDWARDS, McCREE and COMBS, Circuit Judges.

EDWARDS, Circuit Judge.

Appellant appeals from an order of the United States District Court for the Western District of Kentucky dismissing without an evidentiary hearing his application for a writ of habeas corpus. This court had previously heard his first appeal from such a dismissal and remanded for the District Judge to reconsider on a more complete record. The instruction of this court was as follows:

"In view of the holdings of Townsend v. Sain [372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770] we remand the case to the District Court with instructions to the district judge to require counsel for the respondent-appellee to produce and file with the court a transcript of the evidence and procedure at the hearing before the state court judge together with any other pertinent parts of the record in the state court. The district judge will then reconsider his decision dismissing the appellant's petition in the light of those records. In the alternative to requiring the records to be produced the district judge will hold a hearing." Conner v. Wingo, 409 F.2d 21, 22–23 (6th Cir. 1969).

After supplementation of the record by addition of the trial record and the evidentiary record at a state postconviction hearing, the District Judge again dismissed the instant petition without

taking additional evidence. The District Judge held that the state trial and postconviction hearing records showed full and fair hearings "resulting in reliable findings of fact and correct conclusions of law." Appellant again appeals.

The events which form the background for this case happened on April 15, 1962, in or near Hazel, Kentucky, when appellant seized a police vehicle and kidnapped the town marshal and another resident at gunpoint, finally releasing them without injuring them, but making off with the car. Appellant was tried in the Circuit Court for Calloway County, Kentucky, found guilty on a charge of armed robbery, and given a life sentence.

The only defense at trial was insanity. The jury rejected the insanity defense and found appellant guilty. Appellant subsequently filed a motion to vacate sentence, which motion was denied without hearing. The Kentucky Court of Appeals affirmed this judgment. Conners [sic] v. Commonwealth, 400 S.W.2d 519 (Ky.1966), cert. denied, Conner v. Wingo, 385 U.S. 1012, 87 S.Ct. 722, 17 L.Ed.2d 549 (1967).

In 1966 the Supreme Court decided Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), in which the Court held that the trial judge in that case was put on notice by the facts developed before him in the trial of the defendant's possible mental incompetence to stand trial. The Court held that it was a deprivation of due process for the judge not to have ordered a hearing sua sponte on defendant's competence to stand trial.

Appellant thereupon filed another motion to vacate judgment in the Kentucky state courts, asserting that he had similarly been denied due process by the failure of the trial judge to order a competency hearing in his case and that, in fact, he had been incompetent to stand trial. After a full evidentiary hearing the Circuit Court for Calloway County entered adverse findings of fact on both issues and dismissed the petition. On appeal the Kentucky Court of Appeals affirmed. Conner v. Commonwealth, 430 S.W.2d 321 (Ky.1968).

Thereafter appellant filed the instant petition for writ of habeas corpus in the United States District Court for the Western District of Kentucky.

The Kentucky Circuit Judge who heard appellant's second motion to vacate judgment stated the issues which were before him as follows:

"The defendant contends both (1) that he was deprived of a fair trial because he was incompetent to stand trial and (2) that he was deprived of due process because the trial judge failed to make an inquiry into his competence in the face of facts which should have put the judge on notice."

The state judge entered findings and conclusions on both issues adverse to appellant. After review of the complete state court records, the United States District Judge relied upon and in effect adopted the state court's findings and conclusions of law.

Appellant in this appeal contends both courts erred in these decisions. He claims that the competency finding of the Calloway County Circuit Court is invalid under the rule set forth in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). He also claims that the same court's finding of insufficient evidence to put the trial judge on notice of appellant's incompetence is wrong under the holding of Pate v. Robinson, supra. He disputes the United States District Court's reliance on these state court findings. He seeks the issuance of a writ of habeas corpus and a retrial of the original charges, or in the alternative, a remand for evidentiary hearing before the United States District Court.

As to the second issue, appellant's counsel has briefed this case very effectively, seeking to demonstrate that Pate v. Robinson, supra, requires us to grant the writ of habeas corpus. He points out that appellant had several periods

of mental hospital treatment prior to this trial and that he had performed in an unusual and irrational manner in jail and at trial. He argues that these facts put the state trial judge on notice of appellant's incompetence so as to require him *sua sponte* to order a competency hearing.

The state argued that Conner had been sent to a Kentucky state mental hospital immediately after his arrest in 1962, observed there for a month, and then had been returned to jail by the hospital authorities; that the examining psychiatrist at the hospital, Dr. Kernoke, testified at appellant's trial giving as his opinion that Conner was a psychopathic personality but not insane, and that he had seen nothing in Conner's conduct in court during the trial to make him change his mind on the subject of Conner's sanity.

█ Careful analysis of appellant's second issue persuades us that although there are important parallel circumstances between this case and Pate v. Robinson, *supra,* there are also important distinctions:

1) In the *Robinson* case both prosecutor and defense counsel called the trial judge's attention to the defendant's possible incompetence to stand trial. In the instant case there were no such facts and Conner's attorney testified at the hearing on motion to vacate judgment that he believed Conner was capable of understanding the charges and of cooperating in his own defense. While we recognize and accept the Supreme Court view in the *Robinson* case that an incompetent cannot waive the defense of incompetency, we think this distinction is of obvious importance in explaining absence of direct competency inquiry in the trial court.

2) In the *Robinson* case the trial judge denied a brief continuance requested by the defendant to produce a psychiatrist from the Illinois Psychiatric Institute and denied defendant summonses for "material witnesses." No such claims of deprivation of full and fair hearing rights are asserted to have occurred in appellant's trial.

3) In the *Robinson* case the past record of mental instability and irrational behavior as developed before the trial judge was considerably more pronounced than in the instant case. Over a period of years Robinson had killed his infant son and then a woman with whom he was living and an apparent bystander. In the aftermath of the first of these killings, he had twice attempted suicide —once by shooting himself and once by drowning. The record contained evidence of repeated episodes of extreme violence and other episodes when Robinson appeared to others to be in a complete daze and would say nothing at all. He told relatives that something was after him and his mother described "a starey look" and said he seemed to be "foaming at the mouth." The Supreme Court opinion appears to relate Robinson's lifetime of irrational conduct to the fact that a brick dropped from a third story window hit him on the head when he was nine years old.

In comparison to this macabre history—a history which the Supreme Court opinion in *Robinson* spelled out in too great detail to repeat here—the state postconviction hearing judge accurately summarized the facts arguably bearing on appellant's competence as follows:

"The Court finds that the following was made known to the trial judge during the trial of defendant. The defendant attempted to commit suicide by hanging himself in the Calloway County Jail between the time of the crime in April of 1962 and the time of his trial on October 12, 1962. The defendant wrote a suicide note to the jailer at that time in which he stated the suicide was God's will and he must do it since God told him to. The defendant also wrote a suicide letter to his mother expressing his love and affection for her and for a woman named Doris and the baby of Doris and the defendant. In another suicide note to his mother, the defendant expressed

feelings of loneliness and that everybody was out to get him. An inmate of the jail testified: the defendant told him to stay away because the defendant did not know what he was doing; the defendant 'said something about some guys across the hall trying to hurt him;' there were times in the jail when the defendant had headaches, during which times he stared at the wall and didn't say anything. Another inmate of the jail testified that the defendant 'is scared of people' and thinks all the time that they are picking on him. The jailer testified that there were days when the defendant would not talk to anyone and days when he thought someone was after him.

"A psychiatrist testified at the trial that the defendant was not insane at the time of the offense and testified that having observed him during the trial he saw nothing at that time which would change his mind. During the trial in the presence of the jury the defendant just stared ahead but out of the presence of the jury he resumed a normal attitude."

4) In the *Robinson* case there was no expert testimony presented by either side directly bearing on the defense of insanity.[1] In the instant case (despite some vigorous effort on the part of appellant's counsel) the defense produced no expert witness, but the state did. The state called a psychiatrist who was the clinical director at Western State Hospital. This was the hospital to which appellant, on motion of the defense, had been sent for examination immediately after his arrest. Presumably because neither party had seen fit to dispute appellant's competency to stand trial, this witness was not questioned directly about the critical issue on this appeal. Nevertheless, his testimony included a good deal of information and opinion comment which the trial judge had a right to consider relevant to the competency issue.

Portions of Dr. Kernoke's testimony at appellant's trial follow:

"13. In your capacity as chief of the clinical director at Western State Hospital, will you state whether or not there was referred to you and your staff the case of the person of William (Bill) Conners, who is the defendant in this action?

A. Yes. He was admitted to Western State Hospital on a warrant of arrest on April the 19th.

14. You, of course, have been in the Court room here and have heard the testimony here this morning that this incident occurred on the night of April the 15th?

A. Yes sir.

15. It has been testified here his arrest was effected the next day on the 16th. He was in your hospital on the 19th?

A. Yes sir.

16. Some two or three days later?

A. Yes sir.

17. How long was this man in your institution and under your treatment and care and observation?

A. For one month.

18. Exactly one month?

A. Yes sir. He left the 19th of May of this year.

19. During that period of time, say whether you and your staff did, in fact, test and observe this man, William (Bill) Conners?

A. That is correct.

20. In your field as a psychiatrist, did you, based upon your obser-

1. There was a stipulation tendered in *Robinson* that a psychiatrist who had examined Robinson two or three months before trial would, if called, testify that in his opinion on the date of examination Robinson was competent to assist in his defense. The stipulation did not cover any opinion on the insanity issue and appears to have been regarded by the Supreme Court as too remote from time of trial to be of great probative value.

vations and your tests and the treatment you gave him during this period, did you arrive at and do you now have an opinion as to the mental condition of Bill Conners and what it was on the night of April 15, 1962?

A. I do.

21. What is it, Doctor?

BY MR. DONALD OVERBEY: OBJECTION. I object unless the Doctor would state his own observations. It is my understanding the doctor saw the defendant fifteen minutes at two intervals only. If he will base it on his own personal observation I have no objection. But he can not testify what anybody else at Western State Hospital told him.

22. You, yourself, made observations of this man, did you not?

A. Yes sir.

BY THE COURT: OVER-RULED.

23. Tell the jury what your conclusions were as to the mental condition of Bill Conners?

A. My conclusions were that this man was sane. He was suffering from a personality disorder which did not amount to insanity. However, this man could be potentially dangerous under certain circumstances.

24. Under what specific circumstances does this man, in your opinion, become potentially dangerous?

A. Under the influence of alcohol.

25. Is it your opinion from your observation of him on April 19th which was two or three days after this incident occurred, that the same condition existed on April 15th?

A. That is my opinion, yes sir.

26. Doctor, you have said it was your opinion that the man is sane. Included in that, in your opinion, does he know right from wrong?

A. He does. He did at the time I examined him and I believe he did at the time of this incident.

27. What did you find in reference to the IQ of this fellow? Whether it was below normal or above normal or just what?

A. He is above normal in intelligence.

28. He sits here today and has throughout the day, apparently staring into space. Is that or not, in your opinion, an intentional act on his part?

BY MR. OVERBEY: He can't say what the defendant is doing. At this time he hasn't talked to him or spoken to him. And I OBJECT.

BY THE COURT: OVER-RULED.

A. There is nothing that I have observed today that would indicate this man is insane."

On cross-examination, Dr. Kernoke identified other mental hospitals where appellant had been treated. He also testified:

"53. [You] Say, the defendant is suffering from a personality disorder?

A. Yes sir.

54. What kind of personality disorder is he suffering from?

A. Social-pathic personality.

55. Is social-pathic personality a typical mental illness?

A. It is a typical mental disorder.

56. Is it a serious mental illness?

A. It is serious to society.

57. Is it serious to the defendant? He is the one that has it?

A. Yeah.

58. You would agree that a person suffering from social-pathic personality is definitely a mentally ill man?

A. In that sense he is mentally ill.

59. Then, he would be mentally ill, is that correct?

A. Yes."

On redirect examination Dr. Kernoke testified:

"80. Mr. Overbey has asked you about the other hospitals that the defendant was in. I believe you received and studied, as a part of the case history on this man, their treatments and findings on this man, is this right?

A. That is right.

81. Say whether the findings of you and your staff at Western State Hospital concurred or differed with the findings of the other hospitals the defendant was it [sic]?

BY MR. OVERBEY: OBJECTION.

BY MR. LASSITER: You brought it in.

BY THE COURT: OVERRULED, because you asked about it.

BY MR. OVERBEY: Excuse me but I didn't ask about his staff or their opinion at any time.

BY THE COURT: OVERRULED.

BY THE DEFENDANT: EXCEPTIONS.

A. The diagnosis in the other three hospitals concurred exactly with the diagnosis in our hospital. There was no difference at any time in our staff and the other hospitals.

82. In order to sum it up, it was and is your opinion that this man was mentally sane when you saw him on April 19th?

A. That is correct.

83. And that he was sane on April 15th some two or three days before you saw him?

A. That is right.

84. He has the type of personality, I believe you say, that can be set off and become dangerous with the induction of alcohol into his system?

A. That is right.

85. What impressions, if any, did you get from the ability of this man to understand you in the use and knowledge of psychiatric terms and medical terms?

A. He could talk easily and fluently.

BY MR. OVERBEY: OBJECTION. He is going into another field.

SUSTAINED.

BY THE COURT: That is just more or less repetitious."

Thus, there was expert witness testimony from Dr. Kernoke which clearly established his opinion that appellant was above average in intelligence, able to communicate fluently, able to understand the charges against him, and that his unusual conduct at trial did not serve to dispel or change the psychiatrist's previous sanity evaluation.

Bearing also upon the issue of competence is the following summary of the findings of Western State Hospital which was transmitted to the committing judge and subsequently entered as state's Exhibit E in the state court trial. This summary, of course, was likewise before the state court judge who took testimony on appellant's postconviction motion and the United States District Judge from whose judgment this appeal is taken.

"On admission interview this individual in no way appeared to be psychotic and impressed the Staff as being a classical psychopath. It was felt that he should be returned to the. Court. He was so well versed in psychopathic terms that he could easily gull most anyone. His diagnosis was Sociopathic Personality Disturbance, Dyssocial Type.

"At Western State Hospital in Hopkinsville his test findings show that he has full scale I. Q. of 106 with a verbal I. Q. of 113. This man impressed the Staff with his knowledge of psychiatric terms and his ability to manipulate the Staff.

"COMMENT:

This man is sick primarily in terms of society and of conformity with the prevailing culture milieu. He manifests disregard for the usual social codes and as noted has come into conflict with them, however, this man has spent nine years of his 29 years in the Penitentiary and claims that he has not learned how to behave because of that punishment and that further punishment or a further jail sentence would be of no benefit to him and it is possibly right that punishment in his case will avail the patient little and will protect society only for the period he is in jail. It might be that this man could receive help by intensive counseling, however, we are not in a position in this hospital to give this type of treatment and as the patient is a native of North Carolina and has lived most of his life there, that it is possible that he may be able to receive this type of treatment there.

"Mr. Conners is now ready to be released from Western State Hospital. We would of course not consider discharging him except into the custody of the Sheriff of Calloway County or his Deputy or any other person authorized by Calloway County Quarterly Court."

The state court postconviction judge after full hearing entered the following finding on the question of whether the trial judge violated due process by failing to conduct a special hearing on appellant's competence to stand trial and the United States District Judge adopted this finding:

"The Court finds the foregoing circumstances insufficient to put the trial court on such inquiry (that the defendant did not at the time of his trial on October 12, 1962, have the substantial capacity to comprehend the nature and consequences of the proceedings against him and to participate rationally in his defense) that the failure of the trial court to conduct an inquiry into defendant's competency constituted a denial of due process of law."

Obviously, from the length of treatment we have given to this issue, we are by no means unimpressed with appellant's Pate v. Robinson argument. But our final conclusion is that the distinctions pointed out above outweigh the similarities, and that we cannot appropriately base reversal of the judgment of the District Court upon any due process violations to be found in the trial record.

Assuming, however, that we did feel that Pate v. Robinson applied to this case so as to require us to hold that the trial judge *sua sponte* should have held a hearing on appellant's competency to stand trial, we feel that a full and fair hearing on that issue has now been held before the state court postconviction judge. The evidence he relied upon for determining appellant's competency *at trial* was evidence derived from knowledge *contemporaneous to trial.*

At the state postconviction hearing the state court ruled (correctly, we believe) that the burden of proof was upon the petitioner. Hawk v. Olson, 326 U.S. 271, 279, 66 S.Ct. 116, 90 L.Ed. 61 (1945); Humphries v. Green, 397 F.2d 67, 70 (6th Cir. 1968). Appellant sought to sustain that burden by his own testimony alone. Obviously the state court postconviction judge did not believe appellant was telling the truth about his claimed loss of memory. A review of this whole record persuades us that it affords much proof to support the state judge's view.

In addition to other evidence rebutting incompetency, the testimony of his court-

**638**

appointed counsel which follows stands undisputed in the record:

"DIRECT EXAMINATION BY THE HON. JAMES M. LASSITER:

18. Mr. Overbey, I will ask you whether, from the time you first became acquainted with William Conner which was the day of his apprehension or the day afterwards, throughout all of these legal proceedings in which you represented him, were you able to know, and are you now able to state to the court whether in your judgment as an attorney, this man ever indicated to you, any lack of mental capacity to know the nature of the proceedings that were being taken against him or to assist you in your efforts to defend him?

A. Mr. Conner impressed me as an intelligent person who was aware all the time of what crime he was charged with and did actively participate in his defense.

"CROSS EXAMINATION BY THE HON. WELLS OVERBEY:

19. Don, was this trial all held on one day?

A. Yes.

20. Did you see him in jail on the morning before he was brought up here?

A. No sir, I didn't.

21. When was the last time you saw him before he was brought up for trial?

A. I believe it was the day before.

22. What was his condition, mentally?

A. The same as it had been through the proceeding [sic] months.

23. Were you able to talk with him?

A. Yes, I was.

24. Was he able to comprehend what you were saying to him?

A. I thought so.

25. Were his responses normal or abnormal?

A. Normal.

26. What was his reaction in the courtroom during the time of the trial?

A. My instructions * * * I told Mr. Conner that I felt like our only defense to the crime of armed robbery was that of insanity. Which a plea of not guilty by reason of insanity was made. That I felt like it would be beneficial to his interests that he not appear overly alert or duly intelligent in front of the jury.

27. Did he follow your instructions?

A. Yes sir, very well.

28. What was his reaction?

A. Seemedly not to be aware of being in the courtroom or taking any part in his defense nor of being aware of what was going on around him.

29. Well, was that due to your instructions or due to any abnormality, in your opinion?

A. My opinion, he was following instructions because at the conclusion of the trial when the jury had adjourned to deliberate, he then resumed his normal character of behavior and became aware of what was going on around him.

30. During the trial he didn't?

A. No. He did not.

* * * * * *

"REDIRECT EXAMINATION BY MR. LASSITER:

41. Mr. Overbey, let me ask you this question. Was there anything, at any time, in your opinion, on the day of this trial that you saw or knew or observed about Mr. Conner which caused you to feel as the attorney representing him, that a jury should be empaneled on that day to determine his mental ca-

pacity to stand trial on the charges that were pending against him?

A. No sir. I felt him competent to participate in his defense.

42. Do you know of anything that occurred that should have called the attention of the trial judge who at that time was Judge Earl Osborne, and would have impelled him to have empaneled a jury to try his insanity on that day?

A. Nothing other than his behavior in the courtroom on the day of the trial.

43. You have already said that that behavior was following instructions which you had given him?

A. Yes.

44. I believe you say that immediately upon the jury retiring from the jury box, from this courtroom, your client, Mr. Conner, immediately resumed his normal attitude which he had had prior to him being brought in the courtroom on that day?

A. Yes sir.

\* \* \* \* \* \*

BY THE COURT: Don, were you aware of his previous mental records?

"BY MR. DON OVERBEY: Yes sir, Your Honor, I have in my file approximately 15 letters that I wrote to various mental hospitals which he told me he was confined in and asked them for their records in hopes that they might produce a potential witness for the trial and I received responses from approximately 10 of them."

On this record we cannot fault the dismissal of the petition by the state court as to the issue of appellant's claimed incompetence to stand trial. Contrary to appellant's briefs, Dusky v. United States, *supra,* does not suggest an opposite result. The full facts of the *Dusky* case are reported in Dusky v. United States, 271 F.2d 385 (8th Cir. 1959). This case was a direct appeal from a conviction in a federal district court—not an appeal from a district court's denial of a petition for writ of habeas corpus attacking a state court conviction. Dusky's competence to stand trial was placed squarely at issue before the District Court. The burden of proof as to Dusky's competence was on the state. The state's own psychiatric examination showed Dusky to be incompetent to stand trial. The holding of the Supreme Court was simply that on the factual record, the state had not borne its burden of proving Dusky's competence. In our instant appeal we deal with federal habeas corpus attack on a state court judgment and the burden of proof is on the petitioner.

We recognize that at the postconviction hearing the state court judge (after holding correctly that the burden of proof in a motion to vacate judgment was on the petitioner) did not content himself with stating that petitioner had failed to carry that burden. He found affirmatively that petitioner was not telling the truth and denied the petition. But he also held that appellant had substantial capacity in 1962 "to comprehend the nature and consequences of the proceedings against him and to participate rationally in his defense."

We recognize, of course, that the Supreme Court has emphasized "the difficulty of retrospectively determining an accused's competence to stand trial." Obviously, psychiatric evidence based on examination six years after trial has very limited probative value as to competence at the trial. Pate v. Robinson, *supra,* 383 U.S. at 387, 86 S.Ct. at 843; Dusky v. United States, *supra,* 362 U.S. at 403, 80 S.Ct. at 788. But appellant seemingly would have us regard this admonition as a flat bar to any retrospective judicial determinations at delayed postconviction hearings concerning competency at trial. If such a bar proscribed any postconviction findings of competence at trial, it would constitute an automatic retrial opportunity for any convicted prisoner. If this admonition barred a postconviction judicial de-

termination of either competency at trial or incompetency at trial, it would, of course, serve to defeat any postconviction review of a prisoner's claim that he had been tried while incompetent or improperly deprived of a trial determination on that issue. For obvious reasons post-*Robinson* cases generally choose to face the "difficulty" of such determinations rather than be impaled on the horns of the dilemma posed above. *See* United States v. Silva, 418 F.2d 328 (2d Cir. 1969); Kibert v. Peyton, 383 F.2d 566 (4th Cir. 1967); Lee v. State of Alabama, 386 F.2d 97 (5th Cir. 1967), on remand, 291 F.Supp. 921 (M.D.Ala.1967), aff'd, 406 F.2d 466 (5th Cir.), cert. denied, 395 U.S. 927, 89 S.Ct. 1787, 23 L. Ed.2d 246 (1969); *See also* Green v. United States, 128 U.S.App.D.C. 408, 389 F.2d 949 (1967).

We recognize also that in some circumstances the only appropriate remedy may be issuance of the writ and retrial after a current hearing on competence. Hansford v. United States, 124 U.S.App. D.C. 387, 365 F.2d 920 (1966); Rhay v. White, 385 F.2d 883 (9th Cir. 1967). But we believe that the record of evidence contemporaneous to this trial before the state court postconviction judge fairly supports his competency finding and that, in any event, the record demonstrates conclusively that appellant had a full and fair hearing before the Calloway County Circuit Court and failed to carry the burden of proving that he was incompetent to stand trial at his 1962 trial.

 We do not ignore the fact that there remain serious questions about the extent and nature of appellant's illness and about the wisdom and effectiveness of Kentucky's treatment of him.[2] As to these questions all we hold is that no federal constitutional principle required the United States District Court to set aside the state court judgment.

We find no justification for still another remand of this much litigated matter. Our review indicates that appellant had a fair trial and a full and fair postconviction hearing in the Kentucky courts and that the District Judge had a right to rely on the records thereof in denying appellant's motion for writ of habeas corpus. 28 U.S.C. § 2244 (Supp. IV, 1966–68).

The judgment of the District Court is affirmed.

McCREE, Circuit Judge (dissenting).

I respectfully dissent. The state trial judge knew that while awaiting trial in the Calloway County Jail petitioner had attempted to commit suicide by hanging himself, had written suicide notes in which he stated it was God's will that he take his own life, and had exhibited paranoid tendencies by repeatedly expressing fears that other people were out to get him. The trial judge also was aware of petitioner's 20 year history of hospitalization for mental abnormality, and of his having been confined to a mental institution while awaiting trial. Furthermore, the trial judge was confronted with petitioner's trial behavior, which has been characterized as staring into space in an apparent unawareness of the proceedings, and heard testimony by petitioner's fellow inmates and Dr. Kernoke, a psychiatrist. The inmates testified that petitioner had told them to stay away because he did not know what he was doing and that he had stated the "guys across the hall" were trying to hurt him. Dr. Kernoke testified that in his opinion petitioner was not insane but was suffering from a serious mental disorder.[1]

2. Under Kentucky law appellant is currently eligible for consideration for release on parole. At the time of his sentence the applicable Kentucky statute required a minimum of eight years service of a life sentence before parole consideration. Ky. Rev.Stat.Ann. § 439.135 (Baldwin, 3d ed. 1963). The Parole Board has since been given even greater discretion. Ky.Rev. Stat.Ann. § 439.340(3) (Baldwin ed. 1969).

1. It is significant that the Kentucky Court of Appeals has stated that the term "insane" is:

too loose to serve as a reasonable test of whether a person is properly fit to

I would hold that these facts were sufficient to afford the trial judge a bona fide doubt concerning petitioner's competence to stand trial and that the failure *sua sponte* to conduct an inquiry to determine this issue deprived petitioner of his constitutional right to a fair trial. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). *See* Rhay v. White, 385 F.2d 883 (9th Cir. 1967). It is important to remember that the issue under Pate v. Robinson is not whether the trial judge should have concluded, based on the facts before him, that petitioner was incompetent, but only whether the facts should have indicated to the judge that a substantial question existed about petitioner's competence.[2]

Moreover, I find the majority's alternative holding that petitioner received a full and fair hearing on the issue of his competence to stand trial in 1962 unpersuasive. The hearing relied on by the majority was conducted in 1967, approximately four and one-half years after the point in time when petitioner's competence to stand trial was in question. The only witnesses heard by the court, in addition to petitioner himself, were petitioner's attorney during the original trial and a psychiatrist who examined petitioner in 1966. The majority opinion apparently recognizes the limited value of the psychiatrist's *post facto* examination of petitioner and relies primarily on the attorney's testimony concerning his recollections of petitioner's behavior in 1962.

Although the attorney stated that he thought petitioner was competent to stand trial, I question the value of his testimony. At the time of the hearing on petitioner's post conviction motion, the attorney was confronted with the problem of explaining petitioner's bizarre behavior during the trial. He could have testified that petitioner's attitude at trial was consistent with his general behavior. Such a statement, however, may have suggested his own ineffective assistance as counsel, since it would have raised the question, why, in light of petitioner's behavior, defense counsel did not request a competency hearing. *See* Owsley v. Peyton, 368 F.2d 1002 (4th Cir. 1966); Caudill v. Peyton, 368 F.2d 563 (4th Cir. 1966). On the other hand, the attorney could have explained petitioner's behavior by stating that it was a contrived attempt to convince the jury of the validity of petitioner's insanity defense. The attorney gave the latter explanation and even admitted that petitioner was acting pursuant to his instructions. This testimony, however, raises a serious ethical question and, in turn, reflects on the attorney's credibility as a witness.

The only other evidence before the court in 1966 was the transcript of the 1962 trial. Although this transcript contained the testimony of the psychiatrist who examined petitioner prior to trial, I consider it an insufficient basis for upholding a retrospective determina-

---

plead or defend himself in a criminal proceeding. For this purpose, whatever may be the technical classification of his mental state, legally or medically, the test is whether he has substantial capacity to comprehend the nature and consequences of the proceeding pending against him and to participate rationally in his defense. Commonwealth v. Strickland, 375 S.W.2d 701, 703 (Ky. 1964).

2. At the time of petitioner's trial, section 156 of the Kentucky Code of Criminal Practice provided:
 If the court shall be of opinion that there are reasonable grounds to believe that the defendant is insane, all proceedings in the trial shall be postponed until a jury be impaneled to inquire whether the defendant is of unsound mind * * *.
 The Kentucky Court of Appeals has distinguished between insanity and competence to stand trial, *see* n. 1, *supra*, and has held that a jury need not be impaneled in order to determine the latter issue. Commonwealth v. Strickland, *supra*. Moreover, the statute is indicative of Kentucky's concern that its trial judges be vigilant about a defendant's competence to stand trial.

tion of petitioner's competence to stand trial in 1962.[3]

The Supreme Court has "emphasized the difficulty of retrospectively determining an accused's competence to stand trial," and has indicated its lack of confidence in the efficacy of a hearing conducted for this purpose. Pate v. Robinson, *supra*, 383 U.S. at 387, 86 S.Ct. at 836. *See* Dusky v. United States, 362 U.S. 402, 403, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Although these pronouncements may not have established a *per se* rule which forecloses completely the possibility of a hearing to retrospectively determine competence, Lee v. Alabama, 406 F.2d 466, 471 (5th Cir. 1969); United States v. Silva, 418 F.2d 328 (2d Cir. 1969), I do not consider the hearing conducted in this case adequate to justify disregarding the Court's clear preference for a current determination of competence and a new trial if the petitioner is found competent. Pate v. Robinson, *supra*; Dusky v. United States, *supra*.

Accordingly, I would reverse the decision of the District Court and direct it to order petitioner's release after affording the state a reasonable time to initiate a new trial.

3. It is important to observe that the psychiatrist's testimony was directed primarily to the question of petitioner's sanity, and not to the question of his competence to stand trial. *See* n. 1, *supra*.