**Huey R. LEE, Jr., Appellant,**

v.

**Martin J. WIMAN, Warden, etc., and A. Frank Lee, as Commissioner of the Board of Corrections of the State of Alabama, Appellees.**

No. 18212.

United States Court of Appeals
Fifth Circuit.

June 23, 1960.

Ralph L. Kaskell, Jr., New Orleans, La., for appellant.

George D. Mentz, Asst. Atty. Gen. of Alabama, MacDonald Gallion, Atty. Gen. of Alabama, for appellees.

Before RIVES, Chief Judge, and JONES and WISDOM, Circuit Judges.

RIVES, Chief Judge.

This appeal is from an order refusing to entertain, or denying without a hearing, an application for habeas corpus seeking the discharge of a prisoner from state custody. The applicant is confined under sentence of life imprisonment imposed when he was convicted of murder in the first degree.

The record now brought before us through the diligence of court-appointed counsel extends back over a period of eighteen years. On July 6, 1942, Huey R. Lee, Jr. was arrested, confined in the jail of Barbour County, Alabama, and charged with murder in the first degree for the slaying of his father, Huey R. Lee, Sr.

On July 13, 1942, one G. D. Boyd filed a request for a sanity hearing for said Huey R. Lee, Jr.[1] The hearing was conducted before the judge and a jury on July 20, 1942. Both the petitioner and the State were represented by counsel. Some seven physicians and seventeen lay witnesses testified upon that hearing. A general idea of the type of insanity which some of the evidence tended to prove may be gleaned from the affidavit of Dr. Fred Wilkerson of Montgomery, Alabama,[2]

[1.] The request referred to Title 15, Section 428 of the 1940 Code of Alabama, and that seems to be the applicable section rather than Section 426, which would apply only when the confinement is "under indictment." Section 428 reads as follows:

"§ 428. *Inquisition upon alleged insane prisoner; further proceedings.*— If any person in confinement, under indictment, or for want of bail for good behavior, or for keeping the peace, or appearing as a witness, or in consequence of any summary conviction, or by an order of any justice, appears to be insane, the judge of any court of record of the county where he is confined must institute a careful investigation, call a respectable physician and other credible witnesses, and, if he deems it necessary, may call a jury, and for that purpose he is empowered to compel attendance of witnesses and jurors; and if it be satisfactorily proved that the person is insane, the judge may discharge him from imprisonment and order his safe custody and removal to the Alabama state hospitals, where he must remain until restored to his right mind; and then, if the judge shall have so directed, the superintendent must inform the judge and sheriff, whereupon the person must be remanded to prison, and criminal proceedings be resumed, or he be otherwise discharged."

[2.] "For many years I have examined and treated at intervals, Huey R. Lee, Jr. He first came under my care at the age of 17 when he was a student at the University of Alabama. At that time I considered him a brilliant but eccentric, self-centered, egotistical individual who was entirely too serious for a lad of his age. Subsequently to that time I have seen and treated him on numerous occasions but I have not seen him within the last year or two.

"His peculiarities and eccentricities have gotten more and more marked. He has become increasingly anti-social and difficult to get along with. For this reason he could not keep a job. In his estimation, everybody was always wrong while he was always right. He has grown increasingly impatient with those who attempted to advise him. He has developed various ideas and obsessions, one of which he told me several years ago, that he felt that he should always be armed, because someone might speak slurringly of the South and he might have to fight the Civil War all over again. He became more and more irritable and morose and felt that his parents were not doing for him all that they should, despite the fact that he was constantly causing them to spend a great deal of money on him. His tendency toward egotism increased rapidly. He never seemed to have a full comprehension of his duties to society or of his rights under the law.

and from the diagnostic summary and conclusion of Dr. E. D. Bondurant of Mobile, Alabama.[3] The jury returned a verdict reading: "We the Jury find defendant to be sane."

Thereafter, on October 20, 1942, the Grand Jury returned an indictment charging Lee with the murder of his father. Two days later, the Sheriff of the County filed a request that Lee be sent to Bryce Hospital at Tuscaloosa, Alabama, for observation, and accompanied his request with a report from Dr. W. D. Partlow, Superintendent of the Alabama State Hospitals, that " * * * it is my professional opinion there is reasonable ground to believe that said defendant was insane either at the time of the commission of the offense charged in said indictment, or presently."

Lee's attorneys filed a similar request. Acting under Section 425 of Title 15 of the 1940 Code of Alabama,[4] the judge en-

He felt that he could do as he pleased without any restrictions. The last few times I saw him, his increasing resentment was so great that I was fearful that sooner or later he would injure somebody. His mental unbalance was increasing constantly, and, for his protection, and for the protection of others, I suggested to his family on more than one occasion that he be put in an institution for the mentally unsound. On one occasion two or three years ago, his father called me down to the Exchange Hotel, Montgomery, Alabama. His father and mother had the boy with them and he was very agitated and they could not control him. He had threatened his father. They asked me to come and quiet him down. I talked to him a while, but what the effect on him was I do not know. On numerous occasions he has been in my office and has talked wildly and very illogically about things and different ideas he had. As I have mentioned, these tendencies seem to have increased very greatly in recent years and it was for this reason that I regarded him as an unsafe and possibly dangerous person.

"I have no hesitation in stating that, in my opinion, he is definitely and markedly unbalanced."

3. "This man was somewhat abnormal in childhood, and grew progressively abnormal as he grew older. He was nervous, emotionally unstable, sensitive, suspicious, high tempered, and willing to go to any extreme to compel others to do as he wished them to. He was irresponsible in money matters, undependable, got drunk when he pleased, had no conception of the rights of others, no sense of duty nor obligation to his parents, nor to others, nor to society at large. These characteristics, emotional instabilities, abnormal behavior general paranoid reaction were firmly fixed for some years. While it must be said that Huey Lee knew right from wrong and knew what he was doing at all times, and that he chose to act as he did, he was so emotionally abnormal, and of such obviously paranoid character as to, in my opinion make it impossible for him to react in a normal way, which facts should be given due consideration in determining the degree of his responsibility for his recent criminal act."

4. "§ 425. *Investigation of sanity of person charged with capital offense.*— Whenever it shall be made known to the presiding judge of a court by which an indictment has been returned against a defendant for a capital offense, by the written report of not less than three reputable specialist practitioners in mental and nervous diseases, appointed by the judge, or by the written report of the superintendent of the Alabama state hospitals, that there is reasonable ground to believe that such defendant was insane either, at the time of the commission of such offense, or presently, it shall be the duty of the presiding judge to forthwith order that such defendant be delivered by the sheriff of the county to the superintendent of the Alabama state hospitals, who is charged with the duty of placing such defendant under the observation and examination of himself and two members of his medical staff to be named by him, constituting a commission on lunacy, with the view of determining the mental condition of such defendant and the existence of any mental disease or defect which would affect his present criminal responsibility, or his criminal responsibility at the time of the commission of the crime.

"Such defendant shall remain in the custody of the superintendent of the Alabama state hospitals and subject to the observation of and examination by such commission of lunacy for such length of time as may in the judgment of the commission of lunacy be necessary to determine his mental condition so far as it affects his criminal responsibility.

"As soon as such commission of lunacy has reached a conclusion, within the time

tered an order in accordance with such requests. Lee remained in that hospital from October 24, 1942, to August 3, 1943. On July 21, 1943, Dr. W. D. Partlow, Dr. J. S. Tarwater and Dr. P. B. Mayfield, who constituted the commission on lunacy, submitted the following report:

"It is the opinion of each of us, and it is our opinion jointly and collectively, that the said Huey R. Lee, Jr., at the time of his admission to The Bryce Hospital, Tuscaloosa, Alabama, which is one of the Alabama State Hospitals, on October 24, 1942 was insane and that at all times continually from the date of admission to the present date of this report has been insane. It is our opinion that this case is a type of insanity characterized by both grandiose delusions and delusions of persecution. It is our opinion that he in his own estimation so magnifies the ego or self in importance as compared with every other person or consideration that when others with whom he has to deal fail to accept his viewpoint in their attitude toward him in compliance with his wishes or will, he immediately feels and decides such persons are his enemies and are endeavoring to persecute him. We are of the opinion further that his feelings and emotions are governed by these delusions of grandeur and of persecution, and that he, therefore, acts or endeavors to act under such emotions, ideas, beliefs and delusions to vindicate himself against those who, he believes, persecute or conspire to persecute him. We are further of the opinion that such ideas

and in the respect as hereinabove set forth, as to the mental condition of such defendant, it shall make a full written report thereof to the clerk of the court in which the indictment against said defendant is pending, which report shall be placed on file and be accessible to the court, to the solicitor and to the counsel for defendant.

"It shall be the duty of the clerk of said court upon receipt of said report to issue an order to the sheriff of the

and beliefs, and the feelings and emotions incident thereto, so completely dominate and control him and determine his course of action wherever his will is not thwarted by others, as to be abnormal and thus render him abnormal mentally or insane to the extent that distinctly affects his present criminal responsibility and so affects such criminal responsibility at any time from the date of his admission to The Bryce Hospital to the present date of this report.

"Based upon our knowledge of the mental condition of the said Huey R. Lee, Jr., from the date of his admission to The Bryce Hospital October 24, 1942, to the present date, based upon a conservative study of his case with other similar mental conditions which have come under our observation in the course of time, and based upon a study of the history of his case, including facts supplied us relative to the record of the crime of which he is charged, as shown in transcript of certain court records in his case submitted to us for study, it is our further opinion that his mental condition as described above existed prior to his admission to The Bryce Hospital and prior to and at the time of the commission of the crime to the extent that it did affect his criminal responsibility at the time of the commission of the crime.

"Under the provisions of the same Section (425, Title 15, Code of Alabama 1940) above referred to, we understand that with the rendering of this report our obligation and that

county directing that such defendant be remanded and removed to prison and that the criminal proceedings against him be resumed or he be otherwise legally discharged.

"The expense of removing such defendant to and from the hospitals and of maintaining him while there confined, shall be paid in the same manner as provided by law in the case of persons adjudged to be of unsound mind following inquisition in the probate court."

of the Alabama State Hospitals has been discharged and that, therefore, if it is the wish of the Court that the said Huey R. Lee, Jr. be detained longer in this institution as a patient it would be necessary for the Court, or some court jurisdiction, to issue a commitment or an order for the further detention of the said Huey R. Lee, Jr., in said Alabama State Hospitals."

On August 3, 1943, pursuant to an order of the trial court, the Sheriff removed Lee from Bryce Hospital to the jail of Barbour County "to await further criminal proceedings against him." Lee was arraigned and called on to plead to the indictment on October 21, 1943, and the record discloses that three pleas were interposed for him: (1) "Not guilty," (2) "Not guilty by reason of insanity," and (3) "Not guilty by reason of insanity at the time of the commission of the offense." The case came on for trial on October 27, 1943, and Lee's counsel thus stated his pleas to the jury:

"By Mr. Lee: Gentlemen, to that indictment, the Defendant pleads not guilty. That plea puts in issue the material facts in the case. He also says that he is not guilty by reason of insanity, and that plea puts in issue the fact of whether or not, as we in our language sometimes express it, the man was insane and incapable of committing the crime, and under the Alabama laws did not commit any crime, and in this case we say that he is not guilty, and, not guilty by reason of insanity.

"By the Court: You mean to say to the jury that he was insane at the time of the commission of the offense?

"By Mr. Lee: We don't want to differ with the Court, and we plead, as the Court suggested, that he was insane at the time of the commission of the offense." [5]

After a full trial, in which he was represented by counsel and testified in his own behalf,[6] the applicant was convicted of murder in the first degree and his punishment fixed at life imprisonment. The judgment of conviction was affirmed by the Supreme Court of Alabama,[7] and

5. Section 423 of Title 15, 1940 Code of Alabama, provides as follows:

"§ 423. *Insanity must be specially pleaded as a defense for crime.*—When the defense of insanity is set up in any criminal prosecution it must be by special plea, interposed at the time of arraignment and entered of record upon the docket of the court, which in substance shall be, 'not guilty by reason of insanity.' Such plea shall not preclude the usual plea of the general issue, which shall not, however, put in issue the question of the irresponsibility of the accused by reason of this alleged insanity, this question being triable only under the special plea."

6. His testimony was brief, and is here quoted:

"Huey R. Lee, Jr., the Defendant, who, first having been duly sworn, testified as follows:

"Direct examination

"Q. Your name is Huey R. Lee, Jr.? A. Yes.

"Q. You are the Defendant in this case? A. Yes.

"Q. You are charged here with shooting your father, or knocking your father in the head with a shot gun. Did you do that or not? A. I have no recollection of it.

"Q. You have no recollection of it? A. No, sir.

"Q. Now, did your mind at any time become blank? A. Well, if my mind became blank I don't suppose I would be expected to remember anything.

"Q. When did you learn that you were charged with this crime? A. In jail.

"Q. How long after you were brought to jail? A. Well, I don't know.

"Q. You don't know how long you had been in jail, how long after? A. No, sir.

"Q. Do you have any recollection of having that gun in your hand and the way you used it? A. No, sir.

"Q. You have no recollection of striking him in the head or anywhere else? A. No. sir.

"By Mr. Lee: Take him.

"By Mr. Borders: You just don't know anything about it?

"By the Witness: That is true.

"By Mr. Borders: That is all.

"The Defendant rests."

7. Lee v. State, 1945, 246 Ala. 343, 20 So. 2d 471.

certiorari denied by the Supreme Court of the United States.[8]

On January 16, 1946, the applicant, represented by different attorneys, filed in the Supreme Court of Alabama his petition for leave to file in the Circuit Court of Barbour County a petition for writ of *coram nobis*. That petition was very elaborate. It alleged that at the time of his trial Huey R. Lee, Jr. was "insane and helpless in the matter and was in no position to properly direct the issues that should have been had or made in the premises," and prayed for an order granting Lee the right "to file a petition in the Circuit Court of Barbour County, Alabama * * * for a writ of error *coram nobis* to inquire into the facts alleged herein." The Supreme Court of Alabama, after an extended opinion,[9] held:

"The substantiality of petitioner's claim is not shown to the satisfaction of this Court, and in the exercise of the discretion vested in the Court in such matters we are clear to the conclusion that permission to file a writ of error coram nobis in the lower court should be, and is, denied.

"Petition denied."

Certiorari was denied by the Supreme Court of the United States.[10]

On December 20, 1948, Lee filed a petition for habeas corpus in the Circuit Court of Montgomery County, Alabama. This petition was denied and the order affirmed on appeal.[11]

Before the application for habeas corpus now under consideration, two earlier applications in the federal district court had been denied without a hearing: the first on September 11, 1950, C.A. 696–N, and the second on November 18, 1957, C.A. 1388–N. We have examined the original records in each of those cases, and each of them shows that the judge gave the matter careful consideration and detailed his reasons for denying the application without a hearing. The easy way of ruling upon the present appeal would be simply to say that the district court was not required to entertain a third application for habeas corpus. See 28 U.S.C.A. § 2244. However, declining to entertain a second, third, or ninth application for habeas corpus involves a sound judicial discretion to be exercised with regard to what is right and in the interests of justice. Compare Commercial Credit Corporation v. Pepper, 5 Cir., 1951, 187 F.2d 71, 75. Examples might be collected like the case of O'Neal Massey, who beginning in March 1953 made persistent and repeated applications * * * in many courts both state and federal,[12] until he finally secured a reversal from the Supreme Court,[13] was ultimately granted a hearing and was discharged from custody.[14] In the present case, not being entirely satisfied that the ends of justice had been served, we have given full and complete consideration to the appeal.

The habeas corpus jurisdiction of the federal courts over persons in custody pursuant to the judgment of a State court extends to cases in which "He is in

8. Lee v. State of Alabama, 1944, 325 U.S. 888, 65 S.Ct. 1576, 89 L.Ed. 2002.

9. Ex parte Lee, 1946, 248 Ala. 246, 27 So.2d 147, 150.

10. Lee v. State of Alabama, 1946, 329 U.S. 808, 67 S.Ct. 621, 91 L.Ed. 690.

11. Lee v. State, Ala.App.1949, 44 So.2d 606, certiorari denied by the Supreme Court of Alabama, Lee v. State, 1950, 253 Ala. 424, 44 So.2d 607. In its opinion, the Alabama Court of Appeals remarked that *coram nobis*, rather than habeas corpus, appeared to be the appropriate remedy to raise the question of insanity at the time of trial, but actually decided the case on the ground that it was bound by the Alabama Supreme Court's decision in Ex parte Lee, note 9, supra.

12. Massey v. Moore, 5 Cir., 1953, 205 F.2d 665, 671, dissenting opinion.

13. Massey v. Moore, 1954, 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135.

14. Massey v. Moore, D.C.S.D.Tex.1955, 133 F.Supp. 31, 35, the district court holding: "Being insane, his trial was null and void."

custody in violation of the Constitution or laws or treaties of the United States."[15] Ordinarily a State prisoner must exhaust at least one of the remedies available in the courts of the State before habeas corpus in his behalf can be granted by a federal court.[16] As to issues relating to the alleged insanity of the applicant at the time of his trial and conviction, it is clear that Lee's claim of federal constitutional right has been decided adversely to him by the Alabama Supreme Court and an application to the United States Supreme Court has been denied.[17] As to such issues, therefore, state remedies have been sufficiently exhausted and a federal court may grant an application for habeas corpus.[18]

■ The respondent insists, however, that the federal courts should decline jurisdiction because the application charges that at the time Lee was placed upon trial and convicted and sentenced, not only was he insane, but, also, "he was at those times in the absolute clutch of a conspiracy, a conspiracy to which both the court and his own counsel were parties."[19] An application for habeas corpus presented by a prisoner without the aid of counsel will not be dismissed for mere technical defects, but will be considered with solicitude for the essential rights of the accused. Compare Glasser v. United States, 1942, 315 U.S. 60, 71, 62 S.Ct. 457, 86 L.Ed. 680. In our opinion, the federal courts should accept jurisdiction, but should confine their consideration to issues heretofore presented to and decided by the State courts, that is, to issues relating to the alleged insanity of the applicant at the time of his trial and conviction. See Darr v. Bur-

ford, 1950, 339 U.S. 200, 203, 70 S.Ct. 587, 94 L.Ed. 761.

■ The Alabama statutes, heretofore cited,[20] are clear evidence that the laws of Alabama amply provide for recognition of the humane doctrine prevailing in all common-law jurisdictions that a person cannot be tried for criminal misconduct while he is insane. See 44 C.J.S. Insane Persons § 127. As said by Judge Lurton in Youtsey v. United States, 6 Cir., 1899, 97 F. 937, 940:

"It is fundamental that an insane person can neither plead to an arraignment, be subjected to a trial, or, after trial, receive judgment, or after judgment, undergo punishment. In 1 Hale, P.C. 34, 35, it is said:

" 'If a man in his sound memory commits a capital offense, and before his arraignment he becomes absolutely mad, he ought not by law to be arraigned during such frenzy, but he remitted to prison until that incapacity be removed. The reason is, because he cannot advisedly plead to the indictment. * * * And if such person of nonsane memory after his plea, and before his trial, become of nonsane memory, he shall not be tried; or, if, after his trial, he becomes of nonsane memory, he shall not receive judgment, or, if after judgment he becomes of nonsane memory, his execution shall be spared; for were he of sound memory, he might allege somewhat in stay of judgment or execution.'

"To the same effect are all the common-law authorities. 4 Bl. Comm. 24, 25; 2 Bish.Cr.Proc. § 666; Frith's Case, 22 How.St.Tr.

---

15. 28 U.S.C.A. § 2241(c) (3); see Irvin v. Dowd, 1959, 359 U.S. 394, 404, 405, 79 S.Ct. 825, 3 L.Ed.2d 900.

16. The court-created doctrine of exhaustion of state remedies is now embodied in 28 U.S.C.A. § 2254. See Irvin v. Dowd, note 15, supra, and Brown v. Allen, 1953, 344 U.S. 443, 447, 448, 73 S.Ct. 397, 97 L.Ed. 469.

17. See footnotes 9 and 10, supra.

18. Brown v. Allen, 1953, 344 U.S. 443, 446–450, 73 S.Ct. 397, 97 L.Ed. 469.

19. That issue has not been presented to the State courts, though Lee has insisted that his attorneys were negligent in failing to insist upon another inquiry into his "present" insanity before entering upon his trial. See Ex parte Lee, 1946, 248 Ala. 246, 27 So.2d 147, 150.

20. See footnotes 1 and 4, supra.

307; Rex v. Pritchard, 7 Car. & P. 303; Bonds v. State, Mart. & Y. 143; Crocker v. State, 60 Wis. 556, 19 N.W. 435; Taffe v. State, 23 Ark. 34; Freeman v. People, 4 Denio, 9; Underwood v. People, 32 Mich. 1; Nobles v. Georgia, 168 U.S. 398, 18 Sup.Ct. 87; Guagando v. State, 41 Tex. 626; State v. Reed, 41 La.Ann. 581, 7 South. 132."

"Insanity," however, is a word of broad significance and of varied meanings, depending largely upon the transaction in relation to which it is employed. For example, "insanity" which would relieve a person from responsibility for his crimes is widely different from "insanity" which would invalidate his contracts, deeds, or testamentary instruments. The rule in relation to trial for crime has been well stated in Corpus Juris Secundum, with the collection in the notes of many pertinent comments and authorities:

"The test of insanity of an accused precluding his being put on trial for a criminal offense is usually stated to be his capacity to understand the nature and object of the proceedings against him and to con-

duct his defense in a rational manner; and, if he passes this test, he may be tried, although on some other subjects his mind may be deranged or unsound." 44 C.J.S. Insane Persons § 127, p. 284.[21]

■■ Applicant's first insistence is that the record demonstrates that he was insane at the time he was tried, from which it follows that the judgment of conviction and sentence are void, and that the applicant should forthwith be discharged from illegal restraint. That insistence can be reasonably urged only by ignoring completely the test of insanity which will preclude a person accused of crime from being put on trial.[22] Even the report of the lunacy commission, heretofore quoted on page 261 of 280 F. 2d,[23] was addressed entirely to his "criminal responsibility" rather than to his competency to understand the nature of the charge against him and to assist in his defense. Certainly, the fact that the applicant testified reasonably, though briefly, in his own defense[24] is potent evidence that he was not mentally absent from his trial.

■ Secondly, the applicant insists that even if the record is not sufficient to

21. An excellent statement of the rule was made by Circuit Judges Prettyman and Burger in the recent case of Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725, 729, 730:

"As of the time of the trial the question, as prescribed by statute, is whether the accused is mentally competent to understand the nature of the charges against him and to assist in his defense. He may have a mental disease, and the mental disease may have been the cause of his criminal act, and he may be suffering from the same disease at the time of his trial; but it is a scientific fact that he nevertheless may be competent to stand trial under this definition of competency. A paranoiac or a pyromaniac may well understand the charges against him and be able to assist in his defense. 'To assist in his defense' of course does not refer to legal questions involved but to such phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, etc. The standard of measurement of competency to stand trial is different

from the standard of measurement for responsibility for a criminal act."

This Court called attention in Gregori v. United States, 1957, 243 F.2d 48, 54, that:

"Of course it still may be true that a lower standard of mental ability may be sufficient if defendant is represented by counsel than if he is not so protected. Massey v. Moore, 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135."

See also Massey v. Moore, 5 Cir., 1953, 205 F.2d 665, 675, dissenting opinion.

22. See Footnote 21, supra, and the text to which it is appended.

23. That report constitutes perhaps the strongest evidence in favor of the applicant's position. However, that report differs from the finding of the jury provided for in Section 426 of Title 15 in that the report of the lunacy commission as to the mental status of the defendant at the time of his trial is not binding on the trial court. Hawkins v. State, 1958, 267 Ala. 518, 103 So.2d 158, 163.

24. See footnote 6, supra.

require his immediate discharge from imprisonment, the case should be remanded for a plenary hearing on his claim that he was insane at the time of trial in 1943. He cites in support of that insistence two recent decisions of this Court.[25] Those cases, and the Supreme Court decision upon which they were principally based,[26] were cases of federal prisoners convicted of federal offenses and stand for the proposition that a federal prisoner may raise the question of his insanity at the time of trial on a motion under 28 U.S.C.A. § 2255. The question of whether a state prisoner has been accorded due process of law is materially different.[27]

In Smith v. Baldi, cited in footnote 27, supra, the Supreme Court answered in the negative the petitioner's question as to "(1) whether the State should have allowed him to plead guilty without having first formally adjudicated the question of his mental competency." United States ex rel. Smith v. Baldi, 344 U.S. at page 565, 73 S.Ct. at page 393. Further in that case, referring to the execution of the death sentence, the Supreme Court held that:

> "Petitioner's final point is that the United States District Court committed error in refusing to hold a plenary hearing for determination of his sanity. This is refuted by Brown v. Allen, 344 U.S. 443, at 460–465 [73 S.Ct. 397, 409–411], decided today."

344 U.S. at page 569, 73 S.Ct. at page 395. We think that the same answer can be made to the applicant's second contention in this case.

Finally, the applicant insists that after the lunacy commission reported that the applicant was insane, it became necessary for the court again to judicially determine that he was sane before he could be placed on trial. The Alabama Supreme Court has said:

> "One such inquiry had already been made. It is not made to appear in the petition before us that the defendant became insane since that judgment was rendered." Ex parte Lee, 1946, 248 Ala. 246, 27 So.2d 147, 150.

That statement the applicant urges to be erroneous in fact and to be refuted by the findings of the lunacy commission in 1943 on the eve of trial that he was permanently insane. We do not agree. There is no indication that the condition found by the lunacy commission was of recent origin, or had arisen subsequent to the finding of a lay jury in July 1942 that the applicant was sane. A further conclusive answer, we think, is contained in what we have already pointed out, namely, that the report of the lunacy commission was addressed entirely to his "criminal responsibility" rather than to his competency to understand the nature of the charge against him and to assist in his defense.

When the trial and appellate State court records showed that the applicant had not been denied due process of law in the respects claimed, the district court was not required to "entertain" his application for habeas corpus.[28]

The judgment is

Affirmed.

25. Gregori v. United States, 5 Cir., 1957, 243 F.2d 48; Brown v. United States, 5 Cir., 1959, 267 F.2d 42.

26. Bishop v. United States, 1956, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835, vacating Bishop v. United States, 1955, 96 U.S.App.D.C. 117, 223 F.2d 582.

27. See Massey v. Moore, 5 Cir., 1953, 205 F.2d 665, reversed in 348 U.S. 105, 75

S.Ct. 145, 99 L.Ed. 135; United States ex rel. Smith v. Baldi, 1953, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549.

28. 28 U.S.C.A. § 2243, § 2244; Brown v. Allen, 1953, 344 U.S. 443, 461, 73 S.Ct. 397, 97 L.Ed. 469; United States ex rel. Smith v. Baldi, 1953, 344 U.S. 561, 570, 73 S.Ct. 391, 97 L.Ed. 549.