**Freeman Weldon SENSABAUGH**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections.**

**Civ. No. 4–1416.**

United States District Court,
N. D. Texas,
Fort Worth Division.
March 28, 1972.

564

[text redacted]

Sam R. Wilson, Houston, Tex., for petitioner.

Howard Fender, Austin, Tex., Rufus Adcock, Fort Worth, Tex., for respondent.

## MEMORANDUM OPINION

BREWSTER, District Judge.

The petitioner received an indeterminate sentence of not less than two years nor more than life upon his conviction by a jury of murder with malice aforethought in Cause No. 73499, State of Texas v. Freeman Weldon Sensabaugh, in the Criminal District Court No. 2 of Tarrant County, Texas. The conviction was affirmed in Sensabaugh v. State, Tex.Cr.App., 426 S.W.2d 224.

The present petition for writ of habeas corpus, prepared by employed counsel,[1] seeks to set aside such judgment and sentence upon several grounds, but the only question of constitutional dimension supported by evidence sufficient to warrant discussion relates to the petitioner's mental competency to stand trial.[2]

Petitioner's first habeas corpus application in this Court was dismissed without prejudice for his failure to exhaust state remedies. He has now met that requirement, and is back before this Court after the Court of Criminal Appeals of Texas has upheld the convicting court's denial of his post-conviction motion without a hearing. Two preliminary pre-trial conferences have been held to decide whether the questions involved could be determined without a plenary hearing. The Court concluded that such a hearing should be held with petitioner present.

A full evidentiary hearing has now been held, with petitioner and his employed counsel present and participating. The hearing lasted a good part of a day. Several witnesses, including petitioner, testified in person, and considerable documentary evidence was received. The main thrust of the argument for petitioner was that the judge of the convicting court had sufficient information to require him, *sua sponte*, to order an examination to determine petitioner's mental competency to stand trial and to hold a hearing on that issue, and that petitioner's constitutional rights were violated by the judge's failure to do so. At the conclusion of the hearing, the Court was of the opinion that petitioner had failed to prove that the state judge had sufficient information to require him to act on his own initiative, and indicated that it felt that the present petition should be denied. Since that time, the Court has studied the case more thoroughly; and, while its opinion about *sua sponte* action on the part of the judge of the convicting court has not changed, it has reached the conclusion that, aside from that question, the petitioner has produced sufficient evidence to entitle him to a hearing on the question of his

---

1. Petitioner has been unusually fortunate in regard to counsel, both in the murder case and in his post-conviction cases. He has had a different lawyer in the trial of the murder case, in the appeal from his conviction, and in his habeas corpus proceedings; but each one of them has been able, mature and experienced, with special competence in trial of criminal cases. Employed counsel, Sam Wilson of Houston, who has represented petitioner in his post-conviction proceedings, has been practicing law for about fifteen years. His competence as a trial lawyer in criminal cases is well known to those of us judges who have taken particular interest in that field. The qualifications of his other two counsel will be noticed later in this opinion.

2. The other grounds alleged are that (1) petitioner was insane at the time of the commission of the offense; (2) that physical evidence offered by the prosecution at the trial was obtained as a result of an illegal search and seizure; (3) that information was obtained from petitioner while he was being illegally detained and without his being given the required warning. Obviously the first of these three grounds cannot be raised in a proceeding of this kind. Rice v. United States, 5 Cir., 420 F.2d 863 (1969), cert. den. 398 U.S. 910, 90 S.Ct. 1705, 26 L.Ed. 2d 70. There is no evidence to support the last two grounds.

mental competency at the time of his murder trial.

■ Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815, 818 (1966), holds that "the conviction of an accused person while he is legally incompetent violates due process, Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956)." The question may be raised in two ways in a postconviction proceeding: (1) The record in the criminal trial may manifest a bona fide doubt about the mental competence of the accused to stand trial that required the trial court to conduct a hearing on that question on its own initiative. Pate v. Robinson, supra, was that kind of case. (2) Without any showing of mental incompetency in the record of the criminal case, the petitioner may attack his conviction on the ground that he was in fact mentally incompetent to stand trial.[3] Carroll v. Beto, D.C.Tex., 330 F.Supp. 71 (1971), affirmed, 446 F.2d 648, was a case where there was no indication in the record of the proceedings in Carroll's murder case that he was mentally incompetent to stand trial. In the first writ of habeas corpus hearing attacking the validity of the murder conviction on the ground of the incompetency of the accused to stand trial, this Court denied the petition. The Court of Appeals quoted the following from Lee v. Alabama, 5 Cir., 386 F.2d 97, 105 (1967), as authority for requiring a hearing to determine Carroll's competency to stand trial (421 F.2d 1065, at p. 1067):

"... [W]hen a prisoner, either state or federal, seeking post-conviction relief, asserts with substantial facts to back up his allegation, that at the time of the trial he was not mentally competent to stand trial, and that there was no resolution of that precise issue before he was tried, convicted and sentenced, the protection of the Fourteenth Amendment to the Constitution requires that such conviction and sentence be set aside unless upon adequate hearing it is shown that he was mentally competent to stand trial."

The petitioner testified on the present hearing that the man he killed was just an "old wino". It is plain from the evidence that petitioner was one, too, and that he was the kind whose reaction to alcohol was meanness and violence. Petitioner and the deceased had been on a friendly basis for a long time, but they began feuding with each other for some period before the killing. On the afternoon of November 30, 1966, petitioner went to the home of deceased. When he reached the yard, the deceased, standing on the porch of his house, warned him not to come closer. Petitioner ignored the warning, and deceased fired a shot from a single-barreled shotgun. Prosecution testimony indicated that it was fired at a 30° angle away from petitioner. Petitioner claimed that it was directly at him. Petitioner got to deceased with a knife before he could reload the shotgun, and stabbed him seven times in the ensuing struggle. Deceased fell to the ground mortally wounded. Petitioner left the scene immediately, secured some clean clothes, and pulled off and hid the ones with deceased's blood on them.

On the trial of the murder case, the petitioner sought to justify the killing on the ground of self-defense. With the deceased having fired the shot at the time he did, the defense might well have prevailed except for the facts (1) that it was apparently difficult to understand how deceased could have missed the petitioner with a shotgun at almost point

3. In footnote 1 of his dissenting opinion in Pate v. Robinson, supra, Mr. Justice Harlan says that the second method is the more usual one. The following is quoted from that footnote (383 U.S., at p. 388, 86 S.Ct. at p. 843, 15 L.Ed. 2d, at p. 823): "The constitutional violation alleged is the failure to make an inquiry. In the more usual case, the simple claim that a defendant was convicted while incompetent during the trial, there is of course no proof of a constitutional violation until that incompetence is established in appropriate proceedings."

blank range if he had wanted to kill him, and (2) that a week before the killing petitioner had shown a woman a knife which he said he was going to use to kill deceased. The threat was communicated to deceased. Petitioner and his counsel [4] knew that the prosecution would have the testimony from the woman about the threat, but they thought her credibility [5] could be successfully attacked. The attempt was unsuccessful.

There is nothing in the record of the trial of the murder case that was in any way calculated to raise any doubt whatever as to the mental competency of the accused to stand trial. There was no motion, formal or informal, written or oral, requesting an examination or a hearing to determine mental competency. There was no mention of any history of mental problems, nor was there any conduct on the part of the accused during the trial that might have been suggestive of incompetency. From the record of the trial, the court had before it a defendant represented by a competent lawyer, selected and employed by him, with his case well investigated, prepared and presented. There was never any complaint by able counsel of any problems with his client that would suggest inability to co-operate with counsel, or lack

of understanding of the nature of the charges or the facts of the transaction. Prior to the trial, the Court granted three out-of-the-ordinary defense motions described in footnote 4. Those rulings show clearly that the trial judge was scrupulously attempting to see that the defendant got a fair trial, and it is only logical to conclude that he would have granted a request for a mental examination, if it had been made.

The petitioner does not argue about these facts. He says that the trial judge is bound to have read certain newspaper articles about a controversy between the County Veterans Officer and Dr. David Muller, Chief of the Psychiatric Staff at John Peter Smith Hospital (a large charity hospital supported by the City of Fort Worth and Tarrant County) which contained information about the petitioner's mental or emotional problems that put the judge under duty, *sua sponte*, to order a psychiatric examination and a hearing to determine petitioner's mental competency. Judge Winters, the trial judge, did not testify on this hearing. Unknown to this Court at the time the hearing was commenced, Judge Winters was away from the city on vacation. At the conclusion of the hearing, the Court stated

4. Petitioner employed Wallace Craig of Fort Worth to defend him in the murder case. He has been practicing law since 1955. For about ten years, his time has been devoted almost exclusively to trial work. During a portion of that period, he was a partner of Al Clyde, a former state district attorney, and their practice was predominantly in criminal cases. He has tried numerous felony cases, both in the state and federal courts. With the consent of the petitioner, his file on the murder case was admitted in evidence here. It shows as well investigated and prepared a case as one will see. He got written statements from both friendly and adverse witnesses. The thoroughness of counsel's investigation is shown by the fact that he made a trip to Arkansas to interview one of the witnesses. Prior to the trial, he filed motions to suppress, to have an X-ray made of petitioner's arm to confirm whether pellets from deceased's shotgun

were imbedded in it, and to have the Sheriff take petitioner to the scene of the killing to go over the facts with him there. The last two motions were granted. When petitioner was taken to the scene, he was given adequate opportunity to confer with counsel privately out of the hearing of the officer. During the trial of the case, counsel had the City of Fort Worth remove a street stop sign from the area adjacent to deceased's home property, and bring it to court as an exhibit in an effort to show that some of the pellets from deceased's shotgun struck it. The defense thought that that evidence would rebut prosecution testimony as to the direction the shotgun was pointed when fired. The case was well presented.

5. A person experienced in the trial of criminal cases cannot help but get the impression from the record that the witness was the kind of person one would expect to see associating with "old winos".

that he would be willing to recess it until Judge Winters returned, but petitioner's employed counsel opposed such an action. He apparently did not want Judge Winters' testimony.

■■ No authorities have been cited, and none has been found, holding that a court should assume that another judge read certain newspaper articles relevant to a crime for which a person was later tried in his court. There are too many judges like the author of this opinion who do not read such articles. It may be because they hear enough in trials before them about the morbid details of crimes, or because they would rather not receive news media information about a matter that could possibly be the subject of a trial before them. In some instances, it may be both. At any rate, it would be a most unsound principle of law for a court to hold in a collateral action that a judge of another court should have acted *sua sponte* on the basis of newspaper articles. The record must show that there were substantial facts before the judge of the convicting court sufficient to raise a bona fide doubt about the mental competency of the accused to stand trial before the judge is required to act on his own initiative.[6]

Even if Judge Winters read the articles, he had a right to take them as a whole; and if they were so taken, they did not require the action on his part now contended by petitioner. The sum and substance of the several articles was: Dr. Muller, formerly Chief Psychiatrist at the U. S. Public Health Service Hospital near Fort Worth, had recently accepted a similar post at the John Peter Smith Hospital. He was the first full time psychiatrist there. The Commissioner's Court of Tarrant County had theretofore created the political position of County Veterans Officer to look after the affairs of veterans of the military service. The impression this Court gets from the articles is that there were occasions when the worries of Mr. Giles, the County Veterans Officer, brought about by the emotional problems of his veterans apparently could be solved only be confining such veterans in state institutions.[7] For many years, Texas has had a law that permitted the County Judge to order a person committed to a mental health institution for a period not to exceed ninety days for a mental examination.[8] All that is needed is a sworn petition and the certificate of two medical doctors. If the person is found to be mentally ill to the extent that further hospitalization is needed, he can then be committed for an indefinite period for supervision and treatment. Apparently, Mr. Giles thought his judgment as to the necessity for commitment ought to be accepted by Dr. Muller, but the doctor thought otherwise. On several occasions prior to the killing presently involved, Mr. Giles had sent veterans to Dr. Muller with the expectation that he would give one of the two certificates required.[9] Dr. Muller did not agree with the layman's diagnosis, and Mr. Giles started feuding about it in the newspapers. The petitioner was one of such cases; and when he stabbed Steward to death, Mr. Giles complained in the newspaper articles that if Dr. Muller had listened to him

6. Tyler v. Beto, 5 Cir., 391 F.2d 993, 997 (1968) ; United States v. Cooper, 5 Cir., 410 F.2d 1128, 1130 (1969) ; McGarrity v. Beto, S.D.Tex., 335 F.Supp. 1186, 1196 (1971), affirmed, 452 F.2d 1206; Powell v. United States, 125 U.S.App. D.C. 364, 373 F.2d 225 (1966) ; Wilson v. Bailey, 4 Cir., 375 F.2d 663, 668 (1967) ; Conner v. Wingo, 6 Cir., 429 F.2d 630 (1970) ; Tanner v. United States, 10 Cir., 434 F.2d 260 (1970).

7. There is no intention here to impugn the sincerity of Mr. Giles. It just took less to convince him that his problem veterans ought to be confined than was required to convince Dr. Muller.

8. Arts. 5547–31 thru 5547–39, Vernon's Ann. Texas Civil Statutes. It is deemed unnecessary to quote them here as the substance of them as stated in the opinion is not questioned.

9. The law did not require that either one of the certificates be by a psychiatrist. As will be shown later, there were times when one of the certificates was by a radiologist or by a doctor other than a psychiatrist.

about these matters, petitioner would have been confined in a mental institution where he could not have done the killing. One of the articles is a part of Plaintiff's Exhibit 8 admitted in evidence in this hearing. It quotes Dr. Muller as saying that when he examined petitioner, he thought he was mentally responsible, even though he needed psychiatric treatment. He said that he did not feel that he should recommend commitment for him when he was so responsible just because he was "mean or nasty". As between the Veterans Officer and the psychiatrist who had actually examined Sensabaugh, the judge would certainly have had the right to take the diagnosis of the psychiatrist.

The testimony of the newspaper reporter offered by petitioner as a witness does not add enough weight to make petitioner's position tenable. He wrote some of the articles above mentioned fanning Mr. Giles' feud with Dr. Muller. He testified that at some time during the early pendency of petitioner's murder case, Judge Winters told him that he thought he might have to appoint a lawyer for petitioner and require a psychiatric examination. He was testifying to a conversation which had taken place five years before the hearing, and his recollection about the whole transaction was admittedly fuzzy. The Court has no idea from the evidence whether Judge Winters' statement was based upon reliable information or mere speculation. At least part of it was on speculation because there was no necessity for appointment of counsel. The petitioner was able to and did hire an able lawyer. In the absence of reliable evidence to the contrary, it is reasonable to conclude that the rest of the statement about the probable necessity for future appointment of a psychiatrist was likewise based on speculation.

It takes more than rumor or gossip to set in motion official action for determination of the mental competency of an accused to stand trial. Even a simple suggestion or claim of mental deficiency at the time of the trial, without support of substantial facts, is not enough to require a deferment for examination and hearing on the question. Hawks v. Peyton, 4 Cir., 370 F.2d 123, 125 (1966). Some credible basis for a bona fide doubt as to such competency must appear in the record before a court is required to act on its own motion. Tanner v. United States, supra, n. 6

". . . . In other words, there must be some indication to the trial judge that competency to stand trial is a *substantial issue* before a referral of the defendant to a psychiatric examination is required." (Italics are from the opinion). Tyler v. Beto, at p. 997 of 391 F. 2d. See also McGarrity v. Beto, supra, n. 6. The petitioner did not discharge his burden of meeting these requirements.

Since the state court did not hold an evidentiary hearing, its consideration of the case was limited to the question above discussed.[10] On the present plenary hearing in this Court, however, evidence was offered in support of petitioner's claim of mental incompetency which did not involve the contention that Judge Winters should have acted of his own initiative. That evidence showed that for several years prior to the murder of Steward petitioner had been guilty of numerous acts of violence against members of his own family; that on a number of occasions his wife had filed proceedings to have him temporarily committed for mental examination; that each of her petitions was supported by certificates of doctors;[11] and that petitioner was re-

---

10. The state court's denial of the petition was predicated upon the following finding:
"The Court finds that no question involving the Petitioner's sanity was raised at any time prior to or during the trial."

11. Some of those doctors were psychiatrists. However, one of such doctors was Dr. Tom Bond, a radiologist, and others were general practitioners.

ceiving disability benefits as a World War II veteran on account of mental disability. Petitioner also presented Dr. McCauley, a psychiatrist, as a witness during this hearing. He gave the opinion that petitioner was mentally ill in the period covering the time of his trial. That evidence is sufficient under Carroll v. Beto, 5 Cir., 421 F.2d 1065 (1970), to require that petitioner be granted a hearing to determine whether he was mentally competent to stand trial at the time he was convicted for the murder in question.

■ The conclusion just stated presents the questions of whether the murder conviction should be set aside and a new trial granted with directions that proper steps be taken to make a determination of petitioner's mental competency to stand the new trial, or of whether the case should be returned to the state convicting court with directions to make a *nunc pro tunc* determination of petitioner's mental competency as of the time of his former murder trial. The petitioner is entitled to a new trial only if the record before this Court establishes as a matter of law either that he was mentally incompetent to stand trial on the occasion when he was convicted, or that it would not now be possible to make a *nunc pro tunc* determination of his mental competency. The Court is of the opinion that neither one of such propositions is established as a matter of law.

While there is evidence sufficient to present a fact issue as to petitioner's mental competency to stand trial, it falls far short of establishing his incompetency as a matter of law. There has never been a final adjudication that the petitioner was mentally ill.[12] There is no evidence that petitioner had a mental illness that was so constant that he was left without normal periods. It could well be that he was competent and responsible when he was not under the influence of alcohol. The psychiatrist who testified on this hearing admitted that alcoholism had some connection with his problem. The certificate of Dr. Charles Miles, given in support of the temporary commitment appearing in Plaintiff's Exhibit 2 in this case, gave the diagnosis as "Alcoholic Psychosis". On each occasion petitioner was temporarily committed to a state hospital for examination, he was released after he had been there about long enough to "dry out". There is no evidence that petitioner had an organic or constant mental illness or defect. That he did not and that his problem may have been only an emotional disorder is indicated by the statement in his motion for a hearing prepared and filed in this case by his employed counsel that, since the beginning of the post-conviction proceedings, "petitioner has completed a course of psychological counseling and psychiatric treatment which has resulted in his restoration to full sanity." That was after he had been in the penitentiary for several years where he could not hit the bottle as he did when he was living the life of an "old wino". The inference that he was competent when he was not under the influence of alcohol has further support in the fact that neither one of his counsel in the murder case ever had any difficulty whatever

12. There were findings of mental illness in the orders of commitment for examination, but under Texas law they did not amount to an adjudication of mental incompetency. The purpose of the orders was to commit the petitioner for examination *to determine* if he was in fact mentally ill. They were equivalent to the orders federal courts entered for commitment for psychiatric examinations in criminal cases *to determine* the mental competency of the accused, and in cases under the Narcotic Addict Rehabilitation Act for an examination *to determine* whether the subject is a narcotic addict, and, if so, whether he can likely be rehabilitated. Temporary commitments for purpose of examination do not have the weight on the question of mental incompetency that a final adjudication, never set aside, does. James v. Boles, 4 Cir., 339 F.2d 431 (1964); Rice v. United States, 5 Cir., 420 F.2d 863 (1969); Tanner v. United States and McGarrity v. Beto, both supra, n. 6.

counseling with him. Their many conferences with him over a period of months were while he was in jail [13] where he had no access to alcoholic beverages. The record also indicates that Dr. Muller, a psychiatrist with the best of credentials,[14] may not have considered petitioner incompetent.[15] These are only some of the circumstances indicating competency, but they are enough to show that the matter is an issue of fact.

■ Even if the evidence here showed beyond question that the petitioner was suffering from a mental illness at the time of his murder trial, it would not necessarily follow that he was mentally incompetent to stand trial. ". . . [A]n accused may have a mental disorder or deficiency and in some cases still be mentally competent to stand trial." Carroll v. Beto, supra, at p. 77 of 330 F.Supp. See also Lee v. Wiman, 5 Cir., 280 F.2d 257, 265 (1960); Mims v. United States, 5 Cir., 375 F.2d 135, 142 (1967). As is said in 65 Yale L.J. 761, 767, note 8, Hall, *Psychiatry and Criminal Responsibility*: "It is a fact among those who are held legally responsible there may yet be various degrees of mental impairment." Lee v. Wiman, supra, at p. 265 of 280 F.2d, says, " 'Insanity', however, is a word of broad significance and of various meanings, depending largely upon the trans-

action in relation to which it is employed. . . ."

In regard to the second question, there have been only a few cases where it has been held as a matter of law that a retrospective determination of mental competency should not be made. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), Pate v. Robinson, supra, Meador v. United States, 9 Cir., 332 F.2d 935 (1964), and Clark v. Beto, S.D.Tex., 283 F.Supp. 272, are representative of them. The unusually distinctive difficulties of retrospective determination in those cases which set them apart from most others involving the question are discussed in Crail v. United States, 10 Cir., 430 F.2d 459 (1970); Conner v. Wingo, supra, at pp. 639–640 of 429 F.2d; Carroll v. Beto, supra, at pp. 73–75 of 330 F.Supp.; and others. Conner v. Wingo says that while *Dusky* and *Robinson* give admonition that difficulties may be encountered in "retrospectively determining an accused's competence to stand trial", nevertheless, those cases do not hold that mere lapse of time alone is a bar to such a determination. *Conner* goes on to point out two of the bad results that would flow from holding arbitrarily that a retrospective determination cannot be made on account of passage of time.[16] This portion of the discussion of the question concludes with the statement,

---

13. Petitioner was unable to make bond in the murder case.

14. The Court of Appeals, in United States v. Smith, 5 Cir., 436 F.2d 787, 789 (1971), was speaking of Dr. Muller when it said, "The physician's qualifications were of high order . . . ."

15. This information came from the newspaper articles and from the testimony of Dr. McCauley. While Dr. Muller did not testify, the State will have an opportunity to produce his testimony in the mental competency hearing.

16. (1) In cases where the record of the criminal trial is such that the judge of the convicting court should have acted, *sua sponte*, to make a determination of mental competency, the accused could deliberately wait several years to bring

his post-conviction proceeding and automatically get a new trial.

(2) In cases where the record of the criminal trial is insufficient to raise the issue of mental competency, and the burden is therefore on the petitioner to offer adequate proof to raise the issue, he would be helpless unless he should have a permanent mental disease or defect of such a nature as to render him constantly incompetent. If time were a bar to establishing mental competency *nunc pro tunc*, it would likewise be a bar to establishing mental incompetency in that fashion.

In connection with the discussion of this second ground in Carroll v. Beto, at p. 75 of 330 F.Supp., it was pointed out that a bar to retrospective determination of mental condition *nunc pro tunc* would cut off the defense of insanity in many cases.

supported by several cases cited, that: (429 F.2d, at p. 640):

" . . . . For obvious reasons post-Robinson cases generally choose to face the 'difficulty' rather than be impaled on the horns of the dilemma posed above. . . ."

The seriousness of this question has caused it to be explored in depth by the courts in the six years since Pate v. Robinson. The many mandates of the appellate courts remanding post-conviction cases with directions that the trial court determine by hearing, first, if a retrospective determination of competency can be made, and second, if so, whether the accused was mentally competent at the time of his criminal trial,[17] have focused the attention and testimony of psychiatrists on this issue. Additional light shed by that testimony has given the courts a better understanding of the nature of psychiatric examinations and of the reasons why some of them meet insurmountable difficulties in retrospective determinations while others do not. For instance, in Carroll v. Beto, D.C.Tex., 330 F.Supp. 71, affirmed 446 F.2d 648, tried by this Court in 1971, the first question to be determined under the mandate was whether a retrospective determination could be made of competency when the criminal trial was 22 years before. Each side offered a reputable psychiatrist on the question. Both of them testified that, on the basis of the usual psychiatric examination consisting almost entirely of an interview with the patient lasting an hour, it was impossible to make such a determination. One of them, however, had not stopped with the psychiatric interview. He had spent several hours studying the testimony and records that had been offered in evidence in the various hearings arising out of the murder charge against Carroll. With the help of that history,[18] which contained adequate information in regard to Carroll during the period relevant to the time of the murder trial,[19] he was able to give a reliable opinion *nunc pro tunc* as to Carroll's mental competency to stand trial. His opinion *was accepted by the trial court, and the judgment denying the petition was upheld on appeal.* Illuminating testimony resulting from a study of this issue has led to the conclusion that the question of whether a retrospective determination of mental competency can be made is more scientific than legal.[20] Except in ex-

17. Lee v. Alabama, 5 Cir., 386 F.2d 97 (1967), and Carroll v. Beto, 5 Cir., 421 F.2d 1065 (1970), are examples of this type of remand.

18. The fact that psychiatrists spend so much less time now in getting and studying prior histories of patients from sources other than the patients themselves may be due to the fact that their primary concern in their day-to-day practice is in the clinical diagnosis of the patient's then existing condition. Also, the demands for their services have made their time so valuable that the expense of having them delve into outside sources for extensive background information is too much in most cases.

19. The value of pertinent information as to the accused during the period relevant to the trial is pointed out in Conner v. Wingo, supra, where the Court said at p. 637 of 429 F.2d:
"... [W]e feel that a full and fair hearing on that issue has now been held before the state court postconviction judge. The evidence he relied upon for determining appellant's competency *at trial* was evidence derived from knowlledge *contemporaneous to trial.*" (Italics are from the opinion).

20. In Carroll v. Beto, supra, this Court said:
"Whether a person's mental competency as of a certain time can be determined retrospectively is a psychiatric question, rather than a legal one. Judges are no more competent to substitute their judgment on the question for that of a qualified psychiatrist than they are to make such a substitution for the decision of a qualified medical specialist on whether the transplant of a particular vital organ or a successful vaccine for a certain disease is possible. Where there is no expert testimony to aid the judge, he may feel compelled to decide that the difficulties are so great that a retrospective determination appears impossible. But the situation is otherwise where the record contains testimony of qualified experts on

treme cases, the question should be determined on the basis of evidence received in a hearing on it.

There are many cases now where the courts have refused to hold as a matter of law that the mere passage of time barred a retrospective determination of the mental competency of the accused.[21] The time lapses varied from about a year in the *Lewellyng case* to more than 20 years in the *Lee* and the *Carroll* cases, with the period in many of the other cases amounting to as much as four to seven years. In each instance, it was left to the proper trial court to determine from all the evidence on remand whether a decision *nunc pro tunc* could be made. The record before this Court does not justify holding as a matter of law that such a remand should not be made in the present case.

It is necessary to point out only a few of the factors that support the conclusion that this Court should not hold as a matter of law that a retrospective determination of mental competency cannot be made. The accused was examined by psychiatrists and possibly by other doctors during periods near the time of the trial. There is in existence adequate evidence contemporaneous with the periods relevant to the trial shedding light on the mental competency of the accused at that time. This consists in part of medical histories, testimony and records of attorneys who represented petitioner in the murder trial, testimony of the petitioner himself on the murder trial and on the habeas hearing in this Court, and the entire records of the murder trial and of the post-conviction proceedings, as well as any appropriate information of the type that is generally acceptable as medical history.

The question of whether the petitioner was mentally competent to stand trial in his murder case will be determined under the test laid down in Dusky v. United States, supra; that is, whether at the time of his trial, he then had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and whether he then had a rational as well as a factual understanding of the proceedings against him. (362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 825).[22]

the question." (330 F.Supp., at pp. 74–75).

This quotation must be taken in context. The Court was deciding an issue of fact as to whether a *nunc pro tunc* determination could be made in that case. The key testimony on that issue was the testimony of two psychiatrists. In the quotation above, the Court was pointing out that the matter of a *nunc pro tunc* determination of mental competency was more than a basic legal issue, and that reliable scientific testimony thereon should not be rejected in favor of arbitrarily holding as a matter of law that mere lapse of a long period of time was a bar. There was no intention to detract from anything that was said by this same author in Mims v. United States, supra, including the principle that opinion evidence is not necessarily binding on the trier of fact, and the nature of the real value of psychiatric testimony. Neither was it the intention to hold in *Carroll* that psychiatric testimony is necessarily controlling or determinative on the issue under discussion. It was in that case;

but it could well happen, as it did in *Mims*, that it would not be in an exceptional case. The decision of the trier of facts should be made from all the evidence, as it is on issues involving other phases of mental problems.

21. Some of them are the Fifth Circuit cases of Lewellyng v. United States, 320 F.2d 104 (1963); Lee v. Alabama and Carroll v. Beto, both supra, n. 17; Martinez v. United States, 10 Cir., 423 F. 2d 479 (1970); Crail v. United States, 10 Cir., 430 F.2d 459 (1970); Arnold v. United States, 10 Cir., 432 F.2d 871 (1970); Barefield v. New Mexico, 10 Cir., 434 F.2d 307 (1970); Conner v. Wingo, 6 Cir., supra, n. 6; United States v. Silva, 2 Cir., 418 F.2d 328 (1969); Tanner v. United States, supra, n. 6.

22. The assistance contemplated does not extend to legal phases of the case. As was said in James v. Boles, supra, quoting with approval from Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725: " . . . . 'To assist in his defense' of course does not refer to legal

In view of that test, two matters mentioned in the summary just above are adequate in themselves to furnish such relevant contemporaneous information as to petitioner's mental competency at the trial that this Court would not be justified in holding as a matter of law that a retrospective determination could not possibly be made. Those matters are the detailed testimony of the petitioner himself on the murder trial and the testimony of his lawyers as to his conduct and their relationship with him during the trial and on appeal.

The following cases emphasize the significance of the testimony of a petitioner's criminal trial counsel along the line that his client conferred and co-operated rationally with him, understood the charges and the facts, furnished information helpful to the defense, and showed no abnormal behavior. Arnold v. United States, 10 Cir., 432 F.2d 871, 873 (1970) ; Conner v. Wingo, 429 F.2d pp. 630, 638–639, Tanner v. United States, 434 F.2d p. 262, and Wilson v. Bailey, 375 F.2d p. 667, all supra, n. 6 ; Martinez v. United States, supra, n. 21 ; Hawks v. Peyton, 370 F.2d p. 125, supra. Both Mr. Wallace Craig, the defense counsel in the murder case, and Mr. H. Edward Johnson,[23] petitioner's attorney on the appeal, testified at length in the hearing here. The offices of each one of them were within two blocks of the jail where petitioner was confined from the time of his arrest until he was taken to the penitentiary after his conviction was affirmed. Petitioner is the type of defendant who insists on being closely connected with the details and progress of his case. He is a prolific letter writer. Each one of his lawyers had more than the usual number of conferences with him. Mr. Craig could not recollect the number of times he conferred with petitioner, but said he did "on numerous occasions". Some idea of how close a check petitioner wanted to keep on his case is indicated by the fact that he had a dozen or more personal interviews at the jail with Mr. Johnson who was involved *only* with the appeal. They were usually in response to a letter written by petitioner. Each lawyer got a number of written communications from him between the interviews. As has been heretofore mentioned, the complete file of each attorney was offered in evidence here with the consent of petitioner. The petitioner's letters contemporaneous with the period critical to this determination can certainly shed some light on the question of his mental competency at the time. Mr. Craig testified that he got full co-operation from the petitioner in the preparation and the trial ; that petitioner furnished complete information about the case which investigation showed was essentially correct ; that at his request petitioner was taken to the scene of the killing where they went over the transaction in detail ; that he never had any doubt about petitioner's ability to understand what had happened, to explain it to him and to assist in the defense.[24] Mr. Craig knew about

questions involved but to such phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, etc. . . . " (339 F.2d, at p. 433).

23. Mr. Johnson began the practice of law in 1930. In the more than 40 years since then, he has served as prosecutor in criminal cases in his capacities as County Attorney of Burnett County, County Attorney of Hood County and Assistant Criminal District Attorney of Tarrant County, all in Texas. He has been in general private practice in Fort Worth for a number of years, and during that time has handled the defense of many criminal cases. For some reason not shown in the record, Mr. Johnson was court-appointed to represent petitioner on appeal. His other lawyers, before and since, have been employed by him.

24. The following is quoted from the testimony of Mr. Craig:
"Q Did he furnish you with information?
"A He did.
"Q Did your subsequent investigation bear out that that information was essentially correct?
"A It did.

petitioner's temporary commitments and his problems that had caused Mrs. Sensabaugh to instigate the several proceedings to commit petitioner to determine whether he was mentally ill. He discussed the matter with petitioner at length, and came to the conclusion that the situation did not warrant raising any question about petitioner's mental capacity. Similar decisions of counsel have been upheld in James v. Boles, supra, n. 21; McGarrity v. Beto, supra, n. 6; United States v. Silva, 2 Cir., 418 F. 2d 328 (1969). Mr. Johnson testified that he never had any difficulty communicating with petitioner and that he never saw anything that indicated any mental problem. Of course, petitioner was cut off from liquor during all the time these lawyers had contact with him.

■ The courts regard lucid, coherent testimony by a defendant on the trial of his criminal case as an important aid to determining his mental competency to stand trial. In Lee v. Wiman, supra, Judge Rives had this to say (280 F.2d, at p. 265): ". . . . Certainly, the fact that appellant testified reasonably, though briefly, in his own defense is potent evidence that he was not mentally absent from his trial." See also James v. Boles, supra. The petitioner testified at length in the trial of his murder case. His testimony was lucid and coherent. It showed a rational understanding of the nature of the charge and the issues involved, and a good memory of the facts. His answers were responsive to the questions asked. When allowances are made for the inclination of a defendant to color his testimony to present the case to his best advantage, and to be economical with the truth if necessary, petitioner came

"Q Do you now know of any information he might have furnished you that he withheld?

"A None.

"Q Nothing subsequently resulted to indicate that he had hidden anything from you?

"A No.

"Q In connection with your investigation, did you make a trip up to Arkansas looking for a witness by the name of Mr. Smithpeter?

"A Yes, sir, the District Attorney beat me to him.

"Q But you did go to that extent in your investigation?

"A Oh, yes.

"Q Did you at any time as a result of your association with Mr. Sensabaugh feel that he was—that you were unable to prepare your defense because of any inability to communicate on his part?

"A No.

"Q Did you ever have any sense of failure to understand between you and Mr. Sensabaugh, in your contact with him?

"A No.

"THE COURT: Did he appear to understand you?

"A Yes, Your Honor.

"THE COURT: Let me understand this. As I understand, you had numerous conferences with him?

"A That is correct.

"THE COURT: Prior to the time of the trial?

"A That is correct. Not only in the confines of the Tarrant County jail, but in an on-the-scene visit, which I secured from the court, a motion I filed with the court, where we went actually to the crime scene, Your Honor.

"THE COURT: You mean you filed a motion with the court to direct the jailer to take him to the scene with you?

"A Yes, sir, that is correct.

"THE COURT: The scene of the murder?

"A Yes, sir.

"THE COURT: How long were you there?

"A Oh, in the neighborhood, I suppose of half an hour or three-quarters of an hour, during which time I was permitted to be with him out of the hearing range of the officers who accompanied him out there; and he and I walked around over the crime scene.

"THE COURT: Did he show you how it happened—tell you how it happened?

"A Yes, sir, he did.

"THE COURT: Did he appear to understand what had happened?

"A Yes, sir.

"THE COURT: Did you ever have any doubt about that in your mind, about his ability to understand what had happened and to explain it and assist in his defense?

"A No, I never entertained any doubt in my mind. He cooperated quite fully."

through far better than the average defendant.[25] Six years later, he showed the same rational, factual understanding, good memory, and prompt, relevant responses to questions in his testimony in the hearing before this Court.

The issue of the petitioner's mental competency to stand trial has not been adjudicated in the state court;[26] and a hearing should therefore be held within a reasonable time in the state convicting court to determine, first, whether petitioner's mental competency to stand trial can be determined *nunc pro tunc* as of the time of his trial for murder, and second, if so, whether the petitioner was then mentally competent to stand trial under the standard laid down in Dusky v. United States, supra. If such a hearing is not held within a reasonable time, or if either one of those questions is answered in the negative, petitioner will be entitled to a new trial on his murder charge. If the hearing is held within a reasonable time, and if both questions are answered affirmatively, the conviction in the murder case will stand.

Nothing said herein should be construed as an attempt to influence the decision of the state judge on any of the issues before him. The comments made in this opinion are in connection with a determination of whether certain matters were established as a matter of law. The decision is that they are issues of fact. The state judge is the one who has the responsibility of passing on the credibility and weight of the evidence and of reaching his own independent decision on them.

An order will be entered in accordance herewith.

This opinion will serve as the Court's findings of fact and conclusions of law.

---

25. It may well be that there are a few instances where his testimony could be construed as showing bad judgment. While that might be a factor in determining clinical mental illness, it is not in a legal test. Morris v. United States, D.C. Tex., 217 F.Supp. 220, 230 (1963).

26. There had been a hearing in the state convicting court on the mental competency issue in Carroll v. Beto, supra, before the habeas corpus proceeding was filed in this Court. Under those circumstances, it was proper for this Court to proceed to dispose of the case finally without awaiting further action in the state court.